J-A15020-14
J-A15021-14

2015 PA Super 83

| | |
|---|---|
| THOMAS AMATO AND JEAN AMATO, HIS WIFE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| BELL & GOSSETT, CLARK-RELIANCE CORP., COPES-VULCAN, INC., CRANE CO., DEZURIK/COPES-VULCAN, ELECTROLUX HOME PRODUCTS, INC., GOODYEAR CANADA, INC., GREENE, TWEED & COMPANY, INDUSTRIAL HOLDINGS CORP. F/K/A CARBORUNDUM COMPANY, INC., J.A. SEXAUER, INC., JOHN CRANE, INC., LINCOLN ELECTRIC CO., NIBCO, INC., PARKER-HANNIFIN CORP., SAINT-GOBAIN ABRASIVES, INC., SEPCO CORP., SPX CORP., VELAN VALVE COMPANY, TRANE US, INC., INDIVIDUALLY AND F/K/A AMERICAN STANDARD, INC., SUCCESSOR TO THE TRANE CO., AMERICAN RADIATOR & STANDARD SANITARY CORP., KEWANEE BOILER, CO., AND/OR KEWANEE BOILER DIV. OF AMERICAN STANDARD, UNION CARBIDE CORP., AND WARREN PUMPS, LLC. | |
| APPEAL OF: CRANE CO. | No. 2344 EDA 2013 |

Appeal from the Judgment Entered July 19, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): No. 3373 Aug. Term 2011

| | |
|---|---|
| CHARLOTTE VINCIGUERRA, EXECUTRIX OF THE ESTATE OF FRANK VINCIGUERRA, DECEASED, AND CHARLOTTE VINCINGUERRA, WIDOW IN HER OWN RIGHT | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |

J-A15020-14
J-A15021-14

BAYER CROPSCIENCE, INC., AS
SUCCESSOR TO AMCHEM PRODUCTS,
INC., F/K/A BENJAMIN FOSTER
COMPANY, BELL & GOSSETT, BRAND
INSULATIONS, INC., CERTAIN-TEED
CORP., CLEAVER-BROOKS, A DIVISION
OF AQUA-CHEM, INC., CRANE CO.,
DAVID MOSER, DFT, INC., DURABLA
CANADA, LTD., E.I. DUPONT DE
NEMOURS & COMPANY, FOSTER
WHEELER CORPORATION, GEORGIA-
PACIFIC CORP., GOODYEAR CANADA,
INC., THE GOODYEAR TIRE & RUBBER
CO., GOULDS PUMPS, INC., GREENE,
TWEED & COMPANY, INC., GRINNELL
CORPORATION, HAJOCA CORPORATION,
HERMAN GOLDNER CO., INC.,
HONEYWELL, INC., INGERSOLL RAND
COMPANY, JOHN CRANE, INC.,
KEELER/DORR-OLIVER BOILER CO.,
MARLEY COOLING TOWER,
METROPOLITAN LIFE INSURANCE CO.,
OWENS-ILLINOIS, INC., PECORA CORP.,
RILEY STOKER CORP., SEPCO
CORPORATION, INC., SID HARVEY
INDUSTRIES, INC., F/K/A SID HARVEY
MID ATLANTIC, INC., UNION CARBIDE
CORP., WARREN PUMPS, LLC., WEIL
MCLAIN, A DIVISION OF THE MARLEY
CO., A WHOLLY OWNED SUBSIDIARY OF
UNITED DOMINION INDUSTRIES, INC.,
YARWAY CORPORATION, AVOCET
ENTERPRISES, INC., F/K/A
VENTFABRICS, INC., DAP PRODUCTS,
INC., DURO DYNE CORP., AND TREMCO,
INC.

APPEAL OF:  CRANE CO.

No. 2388 EDA 2013

- 2 -

J-A15020-14
J-A15021-14

Appeal from the Judgment Entered August 6, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): September Term, 2010, No. 2682

BEFORE: PANELLA, J., LAZARUS, J., and JENKINS, J.

OPINION BY LAZARUS, J.: **FILED APRIL 17, 2015**

Crane Co. ("Crane") appeals from judgments entered in the Court of Common Pleas of Philadelphia County in two asbestos-related lawsuits. Because the issues raised on appeal in both matters are substantially similar, we have, *sua sponte*, consolidated the cases for purposes of disposition. After careful review, we affirm both judgments.

Thomas Amato worked as a boilermaker at the Philadelphia Naval Shipyard ("PNSY") from 1972 through 1980. During that time, he worked with asbestos-containing products. As a result of his exposure to those products, Amato developed asbestos-related malignant mesothelioma. In 2012, Amato filed the instant suit against twenty-four companies, in which he alleged his malignant mesothelioma was caused by exposure to Cranite and other asbestos-containing materials during his time at the PNSY. Cranite was a sheet gasket material Crane Co. purchased from another manufacturer for use in its business. At trial, the jury found that Amato's exposure to Cranite was a factual cause of his mesothelioma and awarded him and his wife damages in the amount of $2.5 million.

Beginning in 1951 and, except for a two-year break, continuing until 1985, Frank Vinciguerra worked as a sheet metal worker at E.I. DuPont de

- 3 -

Nemours and Company's Chambers Works plant in Deepwater, New Jersey, which brought him into contact with asbestos-containing materials. From 1955 to 1973, Vinciguerra regularly fabricated and installed asbestos-containing gaskets made from, among other products, Cranite. As a result, Vinciguerra developed, and ultimately died from, asbestos-related malignant mesothelioma. As with Amato, the jury found that Vinciguerra's exposure to Cranite was a factual cause of his mesothelioma and awarded his estate damages in the amount of $2.3 million.

Crane filed motions for post-trial relief in both cases, which were denied. These timely appeals followed.

Crane has raised the following issues in both cases:[1]

1.    Whether, in cases that turned on witnesses' ability to identify an asbestos-containing gasket material about 40 years after the fact, the trial court erred by excluding the testimony of Crane's psychology expert, Dr. Charles Weaver, whose proffered testimony regarding human cognitive ability and related scientific studies extended far beyond the knowledge of the average juror?

2.    Whether the trial court erred by failing to consider payments that Plaintiffs received from non-parties, including asbestos personal injury trusts, which potentially enabled Plaintiffs to recover in excess of the full amount of their damages?

3.    Whether the trial court's failure-to-warn jury instruction was inappropriate in light of the Supreme Court's recent decision in **Tincher v. Omega Flex, Inc.**, 104 A.3d 328 (Pa. 2014)?

---

[1] We have rephrased certain of Crane's issues for ease of disposition.

Crane raises the following additional claims in the Amato matter:

4.     Whether, in an asbestos personal injury action tried solely on strict-liability/failure-to-warn theory, upon concluding that the Navy was a sophisticated user of asbestos-containing materials, the trial court erred by not granting Crane a compulsory nonsuit, or charging the jury on Crane's "sophisticated user" defense?

5.     Whether the trial court properly admitted, as Plaintiffs' sole evidence against Crane regarding Navy shipyard practices, an out-of-court statement of a third-party attorney – who lacked personal knowledge of any such matters – regarding the alleged use of another company's asbestos-containing products at a Navy shipyard, when the statement in question was neither subject to cross-examination nor corroborated by other reliable evidence?

Finally, Crane raises the following issue in the Vinciguerra matter:

6.     Whether the trial court erred in refusing to remit the verdict by at least $500,000 to account for the duplicative loss-of-consortium and loss-of-society damages awarded to Plaintiff by the jury?

Crane first asserts that the trial court erred by excluding the testimony of its psychology expert, Dr. Charles Weaver, whose testimony was proffered in an attempt to refute the Plaintiffs' identification, 40 years after the fact, of Cranite being present in their workplaces. Crane offered Dr. Weaver "to address the complex intricacies of refreshing human recollection, which are particularly apposite in an asbestos case, where the plaintiff's lawyer, not plaintiff, often controls the product identification evidence." Brief of Appellant (Amato Case), at 28. This testimony was relevant to the instant cases because, in the Amato case, Crane maintains that "neither

Crane Co. nor Cranite was ever identified as a qualified supplier or product for use on Navy ships" and, thus, would not have been present at the Navy Yard, despite Amato's claim to the contrary. *Id.* at 14. In the Vinciguerra matter, the Plaintiffs relied upon a videotaped deposition of one of Vinciguerra's former co-workers to establish the presence of Cranite at the DuPont plant. Crane asserts that the co-worker's identification of Cranite was prompted by plaintiff's counsel, who showed him "several pictures of gasket materials" and asked him if he could "relate to that." Brief of Appellant (Vinciguerra Case), at 11.

It is well-settled that the purpose of expert testimony is to assist the jury in grasping complex issues not within the ordinary knowledge, intelligence and experience of its members. *Commonwealth v. Mendez*, 74 A.3d 256, 262 (Pa. Super. 2013). Pennsylvania Rule of Evidence 702 governs the admission of such testimony and provides as follows:

**Rule 702. Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. The admission of expert testimony is a matter for the discretion of the trial court and will not be disturbed unless there is a clear abuse of discretion. *Mendez*, 74 A.3d at 262.

Here, the trial court refused to permit Dr. Weaver's testimony on the grounds that our Supreme Court has "clearly and repeatedly" held that credibility questions may not be the subject of expert opinion testimony. For its part, Crane argues that the criminal cases relied upon by the trial court are distinguishable, in that they involve the testimony of eyewitnesses to crimes,[2] who perceived an event that was "unquestionably noteworthy" and testified to what they saw within a relatively short amount of time. Conversely here, Crane argues, the "identity of the product would not have been significant" at the time the witnesses worked with it. Brief of Appellant (Vinciguerra Case), at 20. In addition, in the Vinciguerra case, Crane asserts that the issue is not one of witness credibility; rather that "it was

_____

[2] We acknowledge our Supreme Court's recent decision in *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014), which was issued after the date that these cases were argued. In *Walker*, the Court reconsidered and overruled its longtime decisional law absolutely banning expert testimony in the area of eyewitness identification, finding that such testimony does not improperly intrude upon the jury's credibility determinations. While the *Walker* decision partially undermines the trial court's rationale for excluding Dr. Weaver's testimony, we ultimately affirm the court's decision because we find the subject matter not to be beyond the knowledge possessed by the average layperson. *See* Pa.R.E. 702(a). Moreover, the Court in *Walker* explicitly limited its ruling to criminal eyewitness testimony, a "unique area of the law, where . . . the case law from other jurisdictions and the research is compelling." *Walker*, 92 A.3d at 788.

possible for [the witness's] memory to have been prompted in a manner such that he was disposed to testify to what he was recently told, and not to what he actually recalled[.]" *Id.* at 20.

Amato argues that a jury is "fully equipped, by virtue of its collective knowledge and experience," to assess the reliability of an eyewitness, and that "[t]he workings and reliability of memory and the possibility of forgetting over time are not concepts that elude the jury without the aid of expert testimony." Brief of Appellee (Amato Case), at 21.

With respect to the Amato case, it is clear that an assessment of the credibility and reliability of a witness who is recalling events that occurred forty or more years ago is well within the scope of an average juror's knowledge and experience. Expert testimony is not necessary to assist the jury in coming to the conclusion that, for example, a witness's recollection of an event occurring two weeks prior to his testimony might be more reliable and accurate than his recollection of events that transpired during the Carter administration. Accordingly, it is clear that the court did not abuse its discretion in excluding Dr. Weaver's expert testimony, as it was unnecessary and would clearly have infringed upon the jury's basic function, that of assessing witness credibilty. *Mendez*, *supra*.

Our conclusion is the same in the Vinciguerra case, in which Crane sought to introduce Dr. Weaver's testimony not simply to demonstrate that older memories can be faultier than new ones, but to show that it was

possible for the witness's memory "to have been prompted in a manner such that he was disposed to testify to what he was recently told, and not to what he actually recalled, even if he was doing so subconsiously." Brief of Appellant (Vinciguerra Case), at 20. Here, Crane claims that plaintiff's counsel planted a "false memory" of Cranite into the mind of Louis Faverio, Mr. Vinciguerra's former co-worker, whose testimony was key in linking Cranite to Vinciguerra's workplace, by showing him a picture of Cranite and asking if he recalled using it. Crane claims that Dr. Weaver would have testified as to how "biasing cues at the [memory] retrieval stage can seriously compromise the accuracy of the memory retrieval." *Id.* at 17-18.

We find that expert testimony would not have aided the jury in evaluating the reliability of Faverio's testimony. Rather, the members of the jury would need only draw upon their common knowledge and experience, aided by vigorous cross-examination, to evaluate whether it was possible or likely that Faverio's identification of Cranite was unduly influenced by the photograph shown to him by plaintiff's counsel. The average person understands not only that memories fade and people forget, but that the human mind may be susceptible to suggestion. Accordingly, the trial court did not abuse its discretion in excluding the testimony of Dr. Weaver.

Next, Crane claims that the trial court erred by failing to consider payments that Plaintiffs received from settling non-party tortfeasors, which potentially enabled Plaintiffs to recover in excess of the full amount of their

damages, determined by the jury to be $2.5 million and $2.3 million in the Amato and Vinciguerra cases, respectively. Crane claims that the trial court should have ruled either that Plaintiffs were entitled to recover no additional sums from Crane or that the verdict should be offset to reflect recoveries obtained from non-party tortfeasors.[3] Crane asserts that the trial court also

_____

[3] To the extent that Crane's appellate claim encompasses settlements reached with entities found by the jury to be joint tortfeasors, Crane is entitled to a *pro rata* setoff. The Uniform Contribution Among Tort-feasors Act ("UCATA"), 42 Pa.C.S.A. §§ 8321-8327, establishes a framework for accounting for settlement payments made by joint tortfeasors. The UCATA "dictates the effect of a release to other tortfeasors, the method for computing set-off, and under what circumstances an action in contribution is to be allowed." **Baker v. AC&S**, 755 A.2d 664, 667 (Pa. 2000). The provision controlling set-offs states that:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S.A. § 8326.

Accordingly, in Pennsylvania, three separate set-off scenarios can arise.

> First, if the settlement agreement is silent, the set-off mechanism defaults to a *pro tanto* set-off and the nonsettling defendant is entitled to have the verdict reduced by the amount of consideration paid by the settling tortfeasor. In the second scenario, where the settlement agreement specifically provides for a *pro tanto* set-off, the UCATA envisions that such a specific election will always control.

*(Footnote Continued Next Page)*

erred in refusing to allow discovery regarding the sources and amounts of these other recoveries.

In support of its claim, Crane relies on **Brown v. City of Pittsburgh**, 186 A.2d 300 (Pa. 1962), which it asserts stands for the general rule that "for the same injury, an injured party may have but one satisfaction." **Id.** at 402. However, Crane ignores the underlying context from which that quote arose; indeed, **Brown** is distinguishable from the case at bar. In **Brown**, the plaintiff was injured walking on a sidewalk in front of a church in the City of Pittsburgh. The church paid plaintiff the sum of $2,000 in exchange for a release, fully discharging it from all claims related to the fall. The plaintiff then sued the City of Pittsburgh, which joined the church as an additional defendant. In ruling on cross-motions for judgment on the pleadings, the

---

*(Footnote Continued)* ————————————

> The third scenario is where the settlement agreement specifies a form of set-off other than a *pro tanto* set-off . . . In other words, the settling parties may opt for a set-off mechanism such as a *pro rata* set-off.

**Baker**, 755 A.2d at 667-68. When the parties opt for a *pro rata* release, the amount of recovery against the non-settling joint tortfeasor is reduced by the settling tortfeasor's share of the verdict. **Id.**

Here, the Plaintiffs signed *pro rata* releases with all settling parties. Therefore, Crane is entitled to a reduction based on each settling joint tortfeasor's *pro rata*, and not *pro tanto*, share of the verdict.

- 11 -

trial court found that the church was immune from tort liability and entered

judgment in its favor, while allowing suit against the City to proceed.[4]

On allowance of appeal, the Supreme Court held that any recovery

against the City "must be limited to the amount of the judgment that is in

excess of the sum that has already been paid" by the church. *Id.* at 403.

However, contrary to Crane's assertion, this ruling was not made in blind

furtherance of a "one injury/one satisfaction" rule. Rather, it was the

particular circumstances of the case, including the church's immunity from

liability, which led to the Court's determination. The Court noted that,

ordinarily, the City would have had a right of indemnity to recover any

money which should have been paid by the abutting property owner, i.e.,

the church. However, the Court concluded that where "the right of

indemnity is barred by the defense of charitable immunity, and the charity

has nevertheless made a payment to the injured party, justice demands that

such a payment be looked upon as a partial satisfaction of the plaintiff's

claim, *because the primary obligation is that of the charity*." *Id.* (emphasis

added). In other words, because the City's liability was predicated upon the

negligence of the church, justice required that the City be allowed to offset

_____

[4] Five years after its decision in **Brown**, the Supreme Court held in **Nolan v.
Tifereth Isr. Synagogue**, 227 A.2d 675 (Pa. 1967), that the doctrine of
immunity of charitable institutions from liability in tort no longer exists in the
Commonwealth of Pennsylvania.

the church's settlement payment in lieu of the right of indemnity that was denied to the City by virtue of the church's charitable immunity.

In contrast, in the case at bar, Crane's liability is not predicated upon the liability of any third party, i.e., the settling defendants or non-parties. Rather, its liability is based upon the deleterious effects of its own products upon the Plaintiffs. Thus, the rationale in **Brown** is inapplicable and does not militate in favor of offsetting against the Crane verdict any non-party settlement monies received by the Plaintiffs.[5]

Crane also relies heavily on the decision of a United States Bankruptcy Court in **In re Garlock Sealing Techs., Inc.**, 504 B.R. 71 (Bankr. W.D.N.C. Jan. 10, 2014). In particular, Crane cites **Garlock** in support of its claim of entitlement to offsets for potential post-verdict recoveries by the Plaintiffs. However, as Crane is surely aware, a decision of a federal bankruptcy court is in no way binding upon this Court. Crane presents no binding precedent

---

[5] The two other Pennsylvania cases relied upon by Crane are also distinguishable. **Thompson v. Fox**, 192 A. 107 (Pa. 1937), and **Lasprogata v. Qualls**, 397 A.2d 803 (Pa. Super. 1979), both address the unique situation involving the apportionment of liability between an accident-causing tortfeasor and a treating physician whose subsequent negligence aggravates the original injury. The language Crane extracts from those cases would, in isolation from the broader factual and legal context, seem to support Crane's argument. However, when read in context, it becomes apparent that the cherry-picked language quoted by Crane inappropriately characterizes the salient issues upon which the holdings of the cases are based.

in support of its claim to offsets for such unrealized and speculative recoveries.

In short, Crane has failed to demonstrate that Pennsylvania law requires the offset of settlement funds provided by non-parties not determined to be joint tortfeasors.

> We are aware of no principle of Pennsylvania law that allows a jury to make a finding of liability against a party who has not been sued. In fact, as a panel of this court has recently observed:
>
>> While some states . . . [permit] the apportionment of liability among all tortfeasors, even those who have not been made parties, Pennsylvania's statute does not so provide.

**Ball v. Johns-Manville Corp.**, 625 A.2d 650, 659-60 (Pa. Super. 1993), citing **Kemper National P & C Companies and American Motorists Ins. Co. v. Smith**, 615 A.2d 372, 380 (Pa. Super. 1992). Here, Crane failed to (1) join other settling tortfeasors into the action or (2) submit evidence to establish that the non-parties were joint tortfeasors. Therefore, Crane is not entitled to a reduction of the jury verdict for non-parties to the litigation who settled with the Plaintiffs prior to trial. Instead, the company is only entitled to a reduction of the jury verdict based on settlements made by parties found to be joint tortfeasors by the court.

Finally, we note that Crane's "one injury/one recovery" argument is premised on the assumption that a jury verdict is the only accurate measurement of the "amount of wrong" done to a plaintiff. However, in

***Charles v. Giant Eagle Markets***, 522 A.2d 1 (Pa. 1987), our Supreme

Court noted that it creates a fundamentally flawed premise to

> assume[] that the jury verdict more accurately measures the tortfeasor's obligation than that which is agreed upon between the parties by way of settlement. Such an assumption is without foundation either in reason or experience. *There is no basis for concluding the jury verdict must serve as a cap on the total recovery that a plaintiff may receive.*

***Id.*** at 3 (emphasis added).

For the foregoing reasons, the trial court did not err in declining to offset the jury's verdict based on the recoveries obtained from non-party tortfeasors.

Next, Crane asserts that the trial court's failure-to-warn jury instruction was inappropriate[6] in light of the Supreme Court's recent decision in ***Tincher v. Omega Flex, Inc.***, 104 A.3d 328 (Pa. 2014). Prior to addressing the merits of this claim, however, we must determine whether it is waived. In their supplemental briefs, Plaintiffs argue that Crane waived its current claim – that the Court's ruling in ***Tincher*** entitles it to a new trial on liability, even though the Court declined to adopt the Third Restatement – because Crane "neither preserved nor presented a claim that ***Azzarello*** [***v. Black Brothers Company***, 391 A.2d 1020 (Pa. 1978),] should be overruled

---

[6] We note that Crane does not claim that it was precluded from introducing any evidence that would now be admissible under ***Tincher*** or that any evidence was improperly admitted at trial that would now be precluded under ***Tincher***. Rather, Crane challenges only the jury instruction issued by the court.

either to the [t]rial [c]ourt or to this Court on appeal." Supplemental Brief of Appellee Amato, at 7. For the following reasons, we disagree.

The general rule followed in Pennsylvania is that we apply the law in effect at the time of an appellate decision. *Blackwell v. State Ethics Comm'n*, 589 A.2d 1094 (Pa. 1991), citing *Commonwealth v. Cabeza*, 469 A.2d 146 (Pa. 1983). Thus, "a party whose case is pending on direct appeal is entitled to the benefit of changes in law which occur before the judgment becomes final." *Commonwealth v. Brown*, 431 A.2d 905, 906-07 (Pa. 1981). This general rule assumes, of course, that the issue in question is properly preserved at all stages of adjudication up to and including direct appeal. *Commonwealth v. Parker*, 644 A.2d 1245, 1250 n.2 (Pa. Super. 1994).

Here, in its original brief, Crane's jury instruction issue was framed in terms of trial court error for failure to apply section 2 of the Restatement (Third) of Torts: Products Liability, as opposed to the current Pennsylvania version of strict liability based on section 402A of the Restatement (Second) of Torts. Crane's claim was premised on its assumption that the Pennsylvania Supreme Court would, in *Tincher*, adopt section 2 of the Third Restatement, which would alter Pennsylvania's approach to strict liability inquiries by, *inter alia*, reintroducing fact-finder inquiry into the reasonableness of the defendant's conduct. Pennsylvania's then-current strict liability jurisprudence, based on section 402A of the Second

Restatement of Torts as applied by the Supreme Court in *Azzarello*, essentially excised section 402A's "unreasonably dangerous" language[7] and required that any questions related to the risks and utility of a product were to be decided by the trial court and not the jury.

The Supreme Court granted allowance of appeal on the *Tincher* case shortly after the verdict was issued in the instant matter. In doing so, the Court limited its review to the following issue:

> Whether [the Supreme] Court should replace the strict liability analysis of Section 402A of the Second Restatement with the analysis of the Third Restatement.

*Tincher*, 104 A.3d at 343.

At trial, Crane submitted a proposed failure-to-warn jury instruction that incorporated a reasonableness test:

> A product is defective because of inadequate instructions or warnings when, at the time of sale or distribution, the foreseeable risks of the harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller and the omission of the instructions or warnings renders the product not reasonably safe.

Defendant Crane Co.'s Proposed Instruction No. 3. The trial court declined to issue Crane's instruction.

---

[7] The *Azzarello* court "premised its broad holding on the assumption that the term 'unreasonably dangerous' is misleading to jurors because it 'tends to suggest considerations which are usually identified with the law of negligence.'" *Tincher*, 104 A.3d at 376, quoting *Azzarello*, 391 A.2d at 1025.

Subsequently, in its post-trial motion as well as its original appellate brief,[8] Crane again framed its argument in terms of whether the trial court should have issued its jury charge based on the Third Restatement and directed the jury to consider the reasonableness of Crane's conduct.

While this appeal was pending, the Supreme Court decided **Tincher** on November 19, 2014. In doing so, the Court explicitly declined to adopt the Restatement (Third) of Torts in Pennsylvania. **See id.** at 335 n.4 ("To the extent relevant here, we decline to adopt the Restatement (Third) of Torts: Product Liability §§ 1 *et seq*."). However, the Court overruled its previous decision in **Azzarello v. Black Brothers Company**, 391 A.2d 1020 (Pa. 1978), in which it had held that, in applying section 402A of the Second Restatement, the determination of whether a product was "unreasonably dangerous"[9] was a question of law for the trial court. The **Tincher** court

_____

[8] The trial court did not order Crane to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

[9] Section 402A provides as follows:

> § 402A  *Special Liability of Seller of Product for Physical Harm to User or Consumer*
>
>> (1)   One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

*(Footnote Continued Next Page)*

- 18 -

concluded that, generally, the question of whether a product is unreasonably dangerous is one for the fact finder.

Shortly after *Tincher* was issued, Crane filed a motion to allow supplemental briefing seeking permission to file a supplemental brief to address *Tincher*'s impact on Crane's request for a new trial as to liability. We granted Crane's request and, in its supplemental brief, Crane argued that it was entitled to a new trial as to liability because the trial court's failure-to-warn instruction did not comply with the new "properly calibrated" analysis announced by the Court in *Tincher*.

We conclude that Crane has properly preserved its failure-to-warn jury instruction argument for appellate review. At trial, in post-trial motions and in its original appellate brief, the crux of Crane's argument was that the

*(Footnote Continued)* ─────────────

> (a)  the seller is engaged in the business of selling such a product, and
>
> (b)  it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2)  The rule stated in Subsection (1) applies although
>
> (a)  the seller has exercised all possible care in the preparation and sale of his product, and
>
> (b)  the user or consumer has not bought the product from or entered into any contractual relation with the seller.

court's instruction should include a consideration of the reasonableness of Crane's conduct under the circumstances. The Third Restatement, the adoption of which was under consideration by the Supreme Court at the time, provided a framework for such a factual determination. Although the Court ultimately declined to adopt the Third Restatement, it nevertheless rejected **Azzarello** insofar as that decision had concluded that the term "unreasonably dangerous" had no place in a strict liability jury instruction and was, instead, a legal determination to be made by the court. Thus, the Court, while not adopting the Third Restatement, nonetheless embraced the consideration by juries of whether a product is unreasonably dangerous, as advocated by Crane throughout the pendency of the matter *sub judice*. Accordingly, we will address Crane's claim on its merits.

We begin by noting Plaintiffs' assertion that **Tincher** is distinguishable from the instant matter and is not controlling with respect to claims based on failure to warn. Plaintiffs argue that **Tincher** was a design defect case and that the Court's holding was specifically limited to such claims. In support of this claim, Plaintiffs cite the following language from **Tincher**:

> We recognize – and the bench and bar should recognize – that the decision to overrule **Azzarello** and to articulate a standard of proof premised upon alternative tests *in relation to claims of a product defective in design may* have an impact upon other foundational issues regarding manufacturing or warning claims, and upon subsidiary issues constructed from **Azzarello**, such as the availability of negligence-derived defenses, bystander compensation, or the proper application of the intended use doctrine. *These considerations and effects are outside the scope*

> *of the facts of this dispute* and, understandably, have not been briefed by the Tinchers or Omega Flex.

Supplemental Brief of Appellee Amato, at 18-19, quoting ***Tincher***, 104 A.3d at 409-10 (emphasis added by Appellee). Accordingly, prior to determining whether the instruction, as given by the trial court, included an erroneous or misleading statement of the law as applied to the facts, we must first determine whether ***Tincher*** is applicable to this case or whether, as Plaintiffs assert, it is distinguishable and not controlling.

As Plaintiffs correctly note, the underlying claim in ***Tincher*** was one of defective design, not failure to warn. As Plaintiffs also correctly observe, the Supreme Court emphasized the limited reach of its decision in ***Tincher***, citing the prudence of an "incremental" development of the common law, "within the confines of the circumstances of cases as they come before the court." ***Id.*** at 352, quoting ***Scampone v. Highland Park Care Ctr., LLC***, 57 A.3d 582 (Pa. 2012). The Court rejected adoption of the Third Restatement, in part, because it "presumes too much certainty about the range of circumstances, factual or otherwise, to which the 'general rule' articulated should apply." ***Id.*** at 398.

Despite this emphasis on flexibility and factual nuance, the ***Tincher*** Court nevertheless provided something of a road map for navigating the broader world of post-***Azzarello*** strict liability law. Indeed, the Court acknowledged that, although its "decision is limited to the context of a 'design defect' claim by the facts of this matter, . . . the foundational

principles upon which we touch may ultimately have broader implications by analogy." *Id.* at 384 n.21. Of particular relevance to the instant matter, the Court rejected the blanket notion that "negligence concepts create confusion in strict liability cases" and, thus, should not be placed before a jury, a notion which *Azzarello* had elevated to a "doctrinal imperative." *Id.* at 381. *Azzarello* also

> approved, and thereby essentially required, instructions which informed the jury that, for the purposes of a supplier's strict liability in tort, 'the product must, therefore, be provided with every element necessary to make it safe for its intended use.'

*Tincher*, 104 A.3d at 376, quoting *Azzarello*, 391 A.2d at 1027 n.12.

In *Tincher*, the Court noted that strict liability jurisprudence in the years following *Azzarello* applied the case "broadly, to the point of directing that negligence concepts have no place in Pennsylvania strict liability doctrine[.]" *Id.* The Court further acknowledged the confusion created by those decisions and concluded that the *Azzarello* court's concerns regarding jury confusion were overstated. Indeed, in a jurisdiction applying the Second Restatement, "whether a product is defective depends upon whether that product is 'unreasonably dangerous'" and to entirely separate the inquiry into the former from the inquiry into the latter "is incompatible with basic principles of strict liability." *Id.* at 380. Accordingly, in *Tincher*, the Court returned to the finder of fact the question of whether a product is "unreasonably dangerous," as that determination is part and parcel of whether the product is, in fact, defective.

In the instant matter, Crane's claim is that it was entitled to a failure-to-warn instruction incorporating considerations of reasonableness. Because *Tincher* returned such considerations to the purview of the jury as a question of fact in cases concerning strict liability, we hold that it is applicable to the case *sub judice*. We now turn to a discussion of whether Crane is entitled to relief in light of this conclusion.

> On appeal, this Court examines jury instructions to determine whether the trial court abused its discretion or offered an inaccurate statement of law controlling the outcome of the case. A jury charge is adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error. This Court will afford a new trial if an erroneous jury instruction amounted to a fundamental error or the record is insufficient to determine whether the error affected the verdict.

*Tincher*, 104 A.3d at 351 (internal citations and quotation marks omitted).

> A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal.

*Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013) (citation omitted).

Crane takes issue with the trial court's failure-to-warn jury instruction, which provided as follows:

- 23 -

Even a perfectly made and designed product is defective if not accompanied by proper and necessary warnings and instructions concerning its use. A supplier must give the user warnings and instructions of the risks of using the product that are required or that are created and necessitated by the inherent limitations in the safety of the use of that product. If you find that necessary warnings or instructions were not given, then the defendant is responsible for all harm caused by the failure to warn. And in this case the claim is these suppliers failed to warn of the dangers of using asbestos.

. . .

The claim is that they failed to warn. And the law presumes; that is, the law assumes and you have to presume or assume, that if there had been adequate warning or instruction the plaintiff would have followed those instructions.

N.T. Jury Charge, 2/19/13, at 72-73.

Crane asserts that this instruction "permits no consideration of whether the absence of a warning rendered a product 'unreasonably dangerous'" and, thus, is at odds with **Tincher**, which requires that a jury be permitted to consider that issue. Supplemental Brief of Appellant (Vinciguerra Case), at 10. Crane claims that, based on **Tincher**, it is entitled to a "state-of-the-art" jury instruction, which would permit the jury to make a determination as to the reasonableness of Crane's actions based upon whether or not the risk inherent to asbestos was known or knowable in light of the scientific knowledge available at the time the product was sold.

Plaintiffs argue that the trial court's instruction was appropriate based on the evidence presented at trial. Specifically, Plaintiffs assert that Crane defended these cases on two principle bases: (1) that the identification of Cranite in the Plaintiffs' workplaces was erroneous and (2) that the form of

asbestos used in Cranite did not pose a risk of disease as compared to other forms of the substance. Accordingly,

> Crane's argument in favor of its proposed jury instruction suffers from a fatal flaw. The 'state-of-the-art' defense as advanced by Crane in its proffered jury instruction includes as an evidentiary predicate a recognition . . . that the product in question does, in fact, pose a risk of harm that could be reduced or avoided by the provision of reasonable warnings.

Supplemental Brief of Appellee Amato, at 11. Because Crane contended that, even if Cranite had been present, it posed no risk, Plaintiffs argue that the trial court properly rejected the instruction. We agree.

In charging the jury, the trial court's objective is to explain to the panel how it should approach its task and the factors it should consider in reaching its verdict. *Tincher*, 104 A.3d at 408 (citation and quotation marks omitted). Where evidence supports a party-requested instruction on a theory or defense, a charge on the theory or defense is warranted. *Id.*

At trial, Crane proceeded under the two theories described above. In support of its claim that Cranite was not present in the Plaintiffs' workplaces, Crane presented the testimony of Admiral David Sargent, an expert in marine engineering, naval architecture, navy ship design, construction, operation and repair, including the Navy's contract and procurement procedures. Admiral Sargent testified that the Navy had specific procedures for acquiring consumable materials such as Cranite, including Navy-pre-approved qualified products lists ("QPL"). Admiral Sargent testified that a naval shipyard, such as the Philadelphia location where Amato worked,

would not have utilized gaskets that were not on the QPL. Crane argues that "it is undisputed that neither Crane Co. nor Cranite was ever identified as a qualified supplier or product for use on Navy ships." Brief of Appellant (Amato Case), at 14. Accordingly, Crane asserts, Cranite could not have been present at the PNSY during Amato's tenure there.

In support of its claim that Cranite was not dangerous and, therefore, not defective, Crane presented the testimony of Donna Ringo, an expert in the field of industrial hygiene. Ringo testified that work with gasket materials would not have exposed plaintiff Amato to "any significant levels of asbestos." N.T. Trial, 2/15/13 (A.M. Session), at 62. Crane also presented the testimony of Charles Blake, another industrial hygienist. Blake testified that Vinciguerra would have been exposed to significant levels of asbestos working with asbestos insulation, but not while working with Cranite gaskets. Doctor Charles Sawyer, an expert in the fields of occupational and preventive medicine, also testified on Crane's behalf. He testified that he did not believe that working with gaskets made of Cranite could give rise to mesothelioma and that the risk was "unmeasurable." N.T. Trial, 2/14/13 (A.M. Session), at 95. He testified that he did not believe that the mesothelioma suffered by Amato and Vinciguerra was caused by Cranite gaskets but, rather, by asbestos contained in insulation that they also worked with.

Based on the testimony adduced at trial, Crane asserts that "[t]he jury should have been permitted to decide . . . whether the absence of a warning

rendered Cranite 'unreasonably dangerous.'" Supplemental Brief of Appellant, at 10. Specifically, Crane requested, but was denied, the following instruction:

> A product is defective because of inadequate instructions or warnings when, at the time of sale or distribution, the foreseeable risks of the harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller and the omission of the instructions or warnings renders the product not reasonably safe.

Defendant Crane Co.'s Proposed Instruction No. 3.

Upon review of the record, we conclude that the requested instruction was not justified by Crane's theory of the case and the evidence it presented at trial. Crane's defense was not that Cranite was not "unreasonably dangerous." Rather, Crane asserted that Cranite was not dangerous *at all*. Supplemental Brief of Appellant (Amato Case), at 10 ("Cranite would not have presented a risk of asbestos-related disease to users or bystanders."). Based on this argument, Crane would have no need for a "state-of-the-art" instruction as to the foreseeability of the risks or the reasonableness of its conduct; under Crane's theory of the case, there was no risk, and warnings were not required, because Cranite presented no danger to users or bystanders. Accordingly, Crane was not prejudiced by the failure-to-warn instruction issued by the trial court.

Next, Crane claims that the trial court erred by not charging the jury on its "sophisticated user" defense in the Amato case. Crane asserts that the trial court made a finding that the Navy was a sophisticated user of

asbestos-containing products, yet refused to grant a nonsuit or, failing that, to charge the jury accordingly.

Section 388 of the Restatement (Second) of Torts, otherwise known as the sophisticated user doctrine, provides as follows:

§ 388. Chattel known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388. Comment n to section 388, "Warnings given to third person," states that a supplier's duty to warn is discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who may be exposed to its hazardous effects.

Crane requested the following jury instruction, which the trial court declined to give:

The supplier of a product can reasonably rely on a knowledgeable employer to convey warnings. The supplier is

- 28 -

liable for the user's injuries if its reliance upon the employer was unreasonable under the circumstances.

Defendant Crane's Proposed Instruction No. 6.

The following exchange occurred out of the hearing of the jury between counsel and the trial court:

> THE COURT: Are there any other points for charge hanging out? . . . What's hanging from your perspective?
>
> MR. ROSS [Counsel for Crane]: Crane Co. had asked – requested instructions on the sophisticated user doctrine in the Amato/Vinciguerra cases. It is Crane Co.'s position that both DuPont and the United States Navy, the jury could find they were sophisticated users of asbestos-containing materials. DuPont is an extremely large sophisticated company.
>
> THE COURT: Is that going to be testified to tomorrow?
>
> MR. ROSS: No, no.
>
> THE COURT: Has it been testified to yet?
>
> MR. ROSS: No.
>
> THE COURT: . . . So let's talk about it with respect to the Navy because there certainly has been more than enough testimony that the Navy is a sophisticated user.
>
> MR. ROSS: Dr. Richard Lemen, plaintiff's expert in occupational medicine, Your Honor, testified that he began working at OSHA – with OSHA in 1970, or perhaps with NIOSH, and that the very first issue that NIOSH and OSHA had to tackle in 1970 was asbestos. OSHA is part of the same government that the U.S. Navy is part of, and this predates Mr. Amato's period of work at the shipyard.
>
> THE COURT: Well, *there's no question the Navy is a sophisticated user. There was all kinds of testimony about that from everybody*.
>
> MR. ROSS: That's true, yes.

- 29 -

> THE COURT: Okay. So you don't have to argue that one. Argue that it's the law of Pennsylvania, if it is, in a products liability case.

N.T. Trial, 2/14/13 (P.M. Session), at 85-87 (emphasis added).

In ***Phillips v. A.P. Green Refractories Co.***, 630 A.2d 874 (Pa. Super. 1993), this Court purported to adopt the sophisticated user doctrine embodied in section 388 of the Second Restatement of Torts as a defense to strict liability, as well as negligence, actions. However, as Judge Hudock correctly noted in his concurring and dissenting statement, "[s]ince the majority found the strict liability issue should not have been submitted to the jury, its 'holding' that the doctrine is an affirmative defense is *dicta*." ***Id.*** at 884 (Hudock, J., concurring and dissenting). On allowance of appeal, the Supreme Court also concluded that no strict liability action would lie and, thus, to address the sophisticated user defense "would be to engage in mere *obiter dicta*." ***Phillips Phillips v. A-Best Prods. Co.***, 665 A.2d 1167, 1172 (Pa. 1995). Accordingly, the sophisticated user defense has never been adopted in Pennsylvania and, thus, the trial court properly denied Crane's requested instruction.

Even if the defense were available in Pennsylvania, Crane would not have been entitled to a jury instruction on the doctrine, as it is undisputed that it never provided any warnings to the U.S. Navy regarding the dangers and risks associated with Cranite. Thus, although the Navy may well have been a "sophisticated user" of the material, Crane did not discharge its duty

under section 388 in that it failed to act "in a manner reasonably calculated to assure either that the necessary information would be passed on to the ultimate handlers of the product or that their safety would otherwise be attended to." *Id.* Accordingly, the trial court did not err in refusing the proffered instruction.

Crane next claims, with regard to the Amato matter, that the trial court erred by permitting the Plaintiffs to introduce, on rebuttal, a stipulation demonstrating that the U.S. Navy "had a practice of using gasket materials at the Philadelphia Naval Shipyard that were not included on the Navy's list of qualified, approved gasket materials." Brief of Appellant (Amato Case), at 33. The stipulation in question was signed by counsel for John Crane, Inc.,[10] which was no longer a party to the instant action, in the context of another lawsuit and read, in relevant part, as follows:

> Beginning in 1939, and continuing until 1983, John Crane sold asbestos-containing packing and asbestos-containing sheet gasket material (Style No. 2150) to the Philadelphia Naval Shipyard.

Plaintiffs' Exhibit PA-25, Stipulation of Counsel in *Tiberio v. John Crane, Inc.*, C.C.P. March Term 2011, No. 01661 (Phila. 2011), dated 4/25/12, at ¶ 1. Crane argues that the stipulation is irrelevant and inadmissible as hearsay.

---

[10] John Crane, Inc. is an entity distinct from appellant Crane Co.

In order to preserve a claim on appeal, a party must lodge a timely objection. *Commonwealth v. Murray*, 83 A.3d 137 (Pa. 2013), quoting *Commonwealth v. Montalvo*, 956 A.2d 926, 936 (Pa. 2009). Failure to raise such objection results in waiver of the underlying issue on appeal. *Commonwealth v. Charleston*, 16 A.3d 505 (Pa. Super. 2011), appeal denied, 30 A.3d 486 (Pa. 2011). Here, counsel for co-defendant J.A. Sexauer objected to the admission of the stipulation in question. However, at no time did counsel for Crane lodge an objection. Accordingly, Crane has waived this issue on appeal.

Finally, as to the Vinciguerra matter, Crane claims that the trial court erred in refusing to remit the verdict to account for the "duplicative" loss-of-consortium and loss-of-society damages awarded to the plaintiff. Crane asserts that "when the jury awarded [Mrs. Vinciguerra] damages for her loss of society under the wrongful death statute, by operation of law, it awarded damages for *all* of [her] loss of society, whether arising before or after Mr. Vinciguerra's death." Brief of Appellant (Vinciguerra Case), at 35. Because Crane fails to understand the distinct natures of wrongful death, survival and loss-of-consortium actions, this claim is meritless.

In this case, Mrs. Vinciguerra asserted three separate causes of action. First, on behalf of Mr. Vinciguerra's estate, she made a claim under the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302. Under the statute, survival damages are essentially those for pain and suffering endured by the decedent between the time of injury and death. *Moyer v. Rubright*, 651

A.2d 1139, 1141 (Pa. Super. 1994). The survival action has its genesis in the decedent's injury, not his death and, as such, the recovery of damages stems from the rights of action possessed by the decedent at the time of death. *Id.*

Second, on behalf of Mr. Vinciguerra's statutory survivors, she made a claim under the Pennsylvania Wrongful Death Act, 42 Pa.C.S.A. § 8301.

> The purpose of the Wrongful Death Statute . . . is to compensate the decedent's survivors for the pecuniary losses they have sustained as a result of the decedent's death. This includes the value of the services the victim would have rendered to his family if he had lived. A wrongful death action does not compensate the decedent; it compensates the survivors for damages which they have sustained as a result of the decedent's death.
>
> Under the wrongful death act the widow or family is entitled, in addition to costs, to compensation for the loss of the contributions decedent would have made for such items as shelter, food, clothing, medical care, education, entertainment, gifts and recreation.

*Hatwood v. Hosp. of the Univ. of Pa.*, 55 A.3d 1229, 1235 (Pa. Super. 2012), quoting *Machado v. Kunkel*, 804 A.2d 1238, 1245-46 (Pa. Super. 2002) (internal citation and punctuation omitted). Enumerated members of the decedent's family may recover not only for medical, funeral, and estate administration expenses they incur, but also for the value of the decedent's services, including society and comfort, lost as a result of his death. *Id.* The sole focus of a wrongful death claim is on post-death damages.

Finally, Mrs. Vinciguerra asserted a claim for loss of consortium on her own behalf. Such a claim is intended to compensate one for the loss of

services, society, and conjugal affection of one's spouse occasioned by an injury to that spouse. *Smalls v. Pittsburgh-Corning Corp.*, 843 A.2d 410, 417 (Pa. Super. 2004). Loss-of-consortium damages are limited to the time between the spouse's injury and his death. *Novelli v. Johns-Manville Corp.*, 576 A.2d 1085, 1087 (Pa. Super. 1990).

In support of its claim, Crane relies on *Linebaugh v. Lehr*, 505 A.2d 303 (Pa. Super. 1986), for the proposition that a spouse cannot maintain a separate action for loss of consortium alongside claims for wrongful death and survival. There, the plaintiff's husband was killed when the bicycle on which he was riding was struck by an automobile. Plaintiff filed suit, asserting wrongful death and survival actions. She subsequently settled those claims with the tortfeasor's insurance company. However, she also sought to pursue an independent loss of consortium claim, which the trial court dismissed.

In upholding the trial court's decision, this Court focused its entire analysis on the plaintiff's claim under the wrongful death act and concluded:

> It is clear, therefore, that recovery in a wrongful death action includes damages for the loss of the decedent's society, which is also the essential nature of a claim for loss of consortium. To allow a surviving spouse to maintain a separate cause of action for loss of consortium in addition to the action brought on behalf of the deceased spouse under the wrongful death statute would permit a double recovery for the same death.

*Id.* at 305. This conclusion is correct, as far as the wrongful death act is concerned. However, for whatever reason, the Court did not acknowledge the distinction between a stand-alone pre-death loss of consortium claim and

- 34 -

post-death loss of society recoverable under the wrongful death act. We speculate this may be because the decedent in **Linebaugh** died a sudden death and, thus, no pre-death loss of consortium would have occurred. However, we are not presented with sufficient facts to arrive at a firm conclusion as to the Court's seeming omission. In any event, we find the facts of **Linebaugh** distinguishable and, thus, inapt.

As the foregoing makes clear, damages awarded under the wrongful death act are intended to compensate the decedent's enumerated family members for damages arising as a result of the death. Included in a wrongful death award may be a recovery for loss of *post-death* services, including society and comfort. **Hatwood**, **supra**. A loss of consortium claim, on the other hand, is intended to compensate a surviving spouse for her loss of services, society, and conjugal affection while her spouse was *still living*, yet suffering from the injury in question. **Smalls**, **supra**. Accordingly, contrary to Crane's argument, there is no duplication of damages, as one award is for pre-death loss and the other for that sustained post-death. Thus, the trial court did not err in denying post-trial relief on this claim.

Judgments affirmed.

J-A15020-14
J-A15021-14

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/17/2015