J-A28024-23

2024 PA Super 216

| | | |
|---|---|---|
| KAREN M. CONSTANTINE, ADMINISTRATRIX OF THE ESTATE OF THOMAS A. CONSTANTINE, DECEASED, AND INDIVIDUALLY AS WIDOW IN HER OWN RIGHT | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : : : | No. 2710 EDA 2022 |
| LENOX INSTRUMENT COMPANY, INC., AND ESTERLINE TECHNOLOGIES CORPORATION | : : : | |

Appeal from the Order Entered September 29, 2022
In the Court of Common Pleas of Philadelphia County
Civil Division at No: 170600672

| | | |
|---|---|---|
| KAREN M. CONSTANTINE, ADMINISTRATRIX OF THE ESTATE OF THOMAS A. CONSTANTINE, DECEASED AND INDIVIDUALLY AS WIDOW IN HER OWN RIGHT | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : | No. 2761 EDA 2022 |
| LENOX INSTRUMENT COMPANY, INC. AND ESTERLINE TECHNOLOGIES CORPORATION | : : : : : : | |
| APPEAL OF: LENOX INSTRUMENT COMPANY, INC. | : : | |

Appeal from the Order Entered October 7, 2022
In the Court of Common Pleas of Philadelphia County
Civil Division at No: 170600672

J-A28024-23

BEFORE: OLSON, J., STABILE, J., and COLINS, J.[*]

OPINION BY STABILE, J.: **FILED SEPTEMBER 17, 2024**

These consolidated appeals arise from asbestos litigation in which the plaintiffs, Karen M. Constantine, Administratrix of the Estate of Thomas A. Constantine, deceased, and individually as widow in her own right (referred to collectively as "Constantine"), sought damages from the related corporate entities, Lenox Instrument Company, Inc. (Lenox) and Esterline Technologies Corporation (Esterline). Constantine alleged that the two entities were negligent in exposing her husband (the decedent) to asbestos at his workplace. At a non-jury trial before the Court of Common Pleas of Philadelphia County (trial court), Constantine obtained a final judgment against Lenox in the amount of $2,327,596.76.[1] Lenox now appeals, challenging the trial court's denial of several claims in its post-trial motion; Constantine also cross-appeals the denial of delay damages. For the reasons below, we affirm the trial court's order denying Lenox's post-trial motion and reverse in part the trial court's order on delay damages.

A bench trial was held in this matter on February 14, 2022, February 15, 2022, and February 16, 2022. In its 1925(a) opinion, the trial court summarized the pertinent facts as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In the related appeal at docket number 2676 EDA 2022, Constantine appealed the trial court's order granting the dismissal of Esterline on corporate veil grounds. The issue in that appeal is not germane to the present cross appeals between Constantine and Lenox.

- 2 -

In December 2016, [the decedent] was diagnosed with malignant mesothelioma and passed away as a result on May 14, 2019. [The decedent] was employed by [Lenox] from January, 1972 through October, 1981. During that time, Lenox manufactured and sold heat shields and components of light source products. During his time with Lenox, [the decedent, according to his testimony,] was frequently exposed to asbestos laden dust.

\* \* \* \*

[The decedent] began working at [Lenox] in January of 1972 as a clerk and eventually was promoted to designer draftsman, a position he held until October of 1981. During his employment Lenox manufactured heat shields for [L]ightsource products which involved fabrication of materials which resulted in dust. These heat shields were manufactured with transite boards that contained asbestos. The heat shields were cut, drilled and milled on site at Lenox. Each one of these processes created airborne asbestos laden dust. [The decedent testified that he] was frequently in close proximity with employees sawing the transite board, drilling holes in the board, and shaping it through a milling process. He was also nearby during cleaning of this process which would make the room dusty. Accordingly, [the decedent] frequently breathed the dust that was created between 1974 and 1981.

Lenox did not disclose to [the decedent] that the product he was working with contained asbestos. When working with the transite board, one employee, Mr. [James Dickson] testified that he was warned that before he ate or smoked, he needed to clean the dust produced by his work off of him.

By 1972, evidence that asbestos exposure caused cancer had been recognized. In June of that year, the Occupational Safety and Health Administration [OSHA] put regulations into effect dealing with potential asbestos exposure in the workplace and required air monitoring tests. Lenox failed to perform these testing regulations during the course of [the decedent's] employment.

Weighing the evidence that [the decedent] was exposed to a cancer causing agent, this Court, acting as fact finder, ruled that [Lenox] was negligent.

Trial Court 1925(a) Opinion, 3/2/2023, at 3-4.

- 3 -

The trial court entered a verdict in favor of Constantine, and the sum of $2,218,444.74 was awarded. Of that amount, $818,444.74 was awarded to the decedent's estate pursuant to the Survival Act for injuries suffered prior to the decedent's death. The decedent's wife and children received $700,000.00 pursuant to the Wrongful Death Act. The decedent's wife was also awarded an additional $700,000.00 in damages for her loss of consortium.

Lenox filed a post-trial motion requesting a new trial, or entry of judgment notwithstanding the verdict (JNOV), as well as the entry of nonsuit. Echoing its position at trial, Lenox argued that the decedent had not established the right to relief as a matter of law, and that the verdict was against the weight of evidence. Lenox contended that it was impossible for the decedent to have been exposed to asbestos dust on as many occasions as he had claimed because the heat shields used for the Lightsource were already pre-fabricated and ready for assembly when delivered, and Lenox lacked the equipment needed to alter them. *See* Lenox's Motion for Post-Trial Relief, 5/23/2022, at 8-14, 27-30. Lenox asserted in the alternative that, even if the decedent's claims were credible, Lenox could not be liable because the decedent's "bystander exposure" would have been minimal and insufficient to cause his illness. *See id*., at 14-19, 29-30.

The post-trial motion also included several renewed challenges to the trial court's evidentiary rulings. Lenox had unsuccessfully filed motions *in limine* to limit Constantine's expert witnesses, Dr. Steven Markowitz and Dr.

Evan Alley, from testifying that exposure to asbestos caused the decedent to develop mesothelioma. *See id.*, at 33-40. Relatedly, Lenox asserted that the trial court erred in allowing Constantine to prove its liability without presenting expert testimony on the applicable standard of care that Lenox owed to the decedent. *See id.*, at 41-44.

As to its own witness, Dr. Brent Kerger, Lenox contended that the trial court erred in precluding its expert from opining on the issue of causation. *See id.*, at 44-47. Dr. Kerger, a toxicologist, would have testified as to alternative causes of asbestos-related illnesses and opined that the decedent suffered from mesothelioma for reasons other than occupational exposure to asbestos during his employment with Lenox. *See id*.

Lenox next raised a constitutional ground in its post-trial motion, arguing that our Supreme Court's opinion in *Tooey v. AK Steel Corp.*, 81 A.3d 851 (Pa. 2013), is unconstitutional as applied because it rendered the Pennsylvania Workers' Compensation Act (the Act) inapplicable and allowed Constantine to file a negligence action against Lenox beyond the period allowed by the Act during the decedent's period of employment. *See id.*, at 48-50.

The final grounds in Lenox's post-trial motion were that the trial court erred in not having the deposition transcripts of Gerald Jacobs, John Lang, and Robert Dickson read into evidence, and that the trial court erred in denying Lenox's motion for the entry of nonsuit. *See id.*, at 50-51. The trial

court entered an order denying the post-trial motion in its entirety on September 29, 2022.

Constantine filed a petition for delay damages in the amount of $392,896.41. Lenox filed an opposition to the petition, to which Constantine filed a reply. Lenox then filed a sur-reply, and argument on Lenox's post-trial motions and Constantine's petition for delay damages was heard on September 7, 2022. Constantine's petition for delay damages was granted in part and denied in part on October 7, 2022, resulting in an increase of $109,152.02 to the judgment, and a final amount of $2,327,596.76. Constantine filed a *praecipe* for final judgment on October 18, 2022, and judgment was entered on that same date.

Lenox and Constantine each timely filed their respective cross appeals, and the trial court entered a 1925(a) opinion giving the reasons why its orders should be affirmed. **See** Trial Court 1925(a) Opinion, 3/2/2023. Lenox, the appellant at docket number 2761 EDA 2022, now raises a number of issues in its brief, which we have condensed and reordered as follows:

1. Whether the trial court abused its discretion in ruling that the verdict was not against the weight of the evidence;

2. Whether Lenox's motion for nonsuit was properly denied;

3. Whether the standard of care evidence supporting Constantine's negligence claim was legally sufficient;

4. Whether the expert opinions of Dr. Brent D. Kerger regarding medical causation were properly excluded;

5.    Whether the trial court erred in allowing Dr. Gerald Markowitz to testify as an expert about the history of asbestos;

6.    Whether the trial court erred in allowing Dr. Steven Markowitz to opine as an expert on the specific medical cause of the decedent's illness;

7.    Whether the trial court erred in allowing Dr. Evan Alley to opine as an expert on the specific medical cause of the decedent's illness;

8.    Whether the holding of **Tooey v. AK Steel Corp.**, 81 A. 3d 851 (Pa. 2013), is unconstitutional, as applied in this case;

9.    Whether the trial court erred in instructing the parties to submit transcripts upon which the parties relied instead of having the transcripts read into the record during trial; and

10.  Whether the trial court erred in awarding damages in excess of the amounts given by Constantine's expert witness on damages.

**See** Brief of Appellant/Cross-Appellee, at 8-11.[2]

Constantine, in turn, raises the following issues in her cross-appeal,

docketed at number 2710 EDA 2022, which we have copied below verbatim:

Whether the trial judge committed an error of law and misinterpreted Rule 238 of the Pennsylvania Rules of Civil Procedure and/or abused his discretion by denying, in part, Constantine's Petition for Delay Damages, in the total amount of $283,744.39, for the following periods and amounts:

1.    June 20, 2018 to December 31, 2018 ($64,852.26), when Constantine allegedly caused delays in adding [Esterline] as a party to the action;

---

[2] To the extent Lenox raised or attempted to raise any other issues, we find that they are subsumed within the enumerated grounds for relief summarized above.

- 7 -

2. December 11, 2019 to November 21, 2020 ($121,522.18), when the case was moved into deferred status in order to allow Constantine to seek an interlocutory appeal; and

3. The years 2021 and 2022 ($97,369.95), when Constantine's alleged delays caused the case to run into further delays from the COVID-19 pandemic.

Brief of Appellee/Cross Appellant, at 5-6 (suggested answers omitted).

Each of the above issues are addressed in turn below, beginning with Lenox's *first* claim that the trial court abused its discretion in denying a new trial and finding that the verdict was not contrary to the weight of the evidence. According to Lenox, the evidence established that, at most, the decedent was exposed to a *de minimus* amount of asbestos at Lenox's facility where he worked, and that, as a matter of law, Lenox could not be held liable. Lenox discounts the decedent's testimony that he was regularly exposed to asbestos dust by emphasizing the conflicting testimony of its witnesses that the fabrication of Lightsource parts took place off-site. *See* Appellant's Brief, at 46-53.

On review of a ruling denying a weight of evidence claim, the following standard applies:

Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court may award a judgment notwithstanding the verdict or a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. When a fact finder's verdict is so opposed to the demonstrative facts that looking at the verdict, the mind stands baffled, the intellect searches in vain for cause and effect, and reason rebels against the bizarre and erratic conclusion, it can be said that the verdict is shocking.

However, [i]f there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm. An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party.

*Spencer v. Johnson*, 249 A.3d 529, 566 (Pa. Super. 2021) (quoting

*McFeeley v. Shah*, 226 A.3d 582, 594 (Pa. Super. 2020)).

Here, we find that the trial court did not abuse its discretion because the verdict was not so contrary to the weight of the evidence that it would shock one's sense of justice. One count of negligence was alleged against Lenox. The elements of negligence are:

(1) a duty or obligation recognized by the law that requires an actor to conform his actions to a standard of conduct for the protection of others against unreasonable risks; (2) failure on the part of the defendant to conform to that standard of conduct, *i.e.,* a breach of duty; (3) a reasonably close causal connection between the breach of duty and the injury sustained; and (4) actual loss or damages that result from the breach.

*Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 654 (Pa. Super.

2002).

"To establish a *prima facie* case of negligence, a plaintiff must produce sufficient facts to show that the defendant's negligence was both the cause-in-fact and the legal, or proximate, cause of her injuries." **Straw v. Fair**, 187 A.3d 966, 993 (Pa. Super. 2018); **see also First v. Zem Zem Temple**, 686 A.2d 18, n.2 (Pa. Super. 1996) (citing **Reilly v. Tiergarten, Inc.**, 633 A.2d 208 (Pa. 1993)). Factual cause (also referred to as cause-in-fact) is established where it is shown that the plaintiff's injuries would not have occurred "but for" the defendant's alleged conduct. **Straw**, 187 A.3d at 993.

"To establish proximate [or legal] causation, a plaintiff must adduce evidence to show that the defendant's act was a substantial factor in bringing about the plaintiff's harm." **Rost v. Ford Motor Co.**, 151 A.3d 1032, 1049 (Pa. 2016).[3] Although factual and legal causation still are discussed in our case law when addressing causation, to avoid jury confusion, current standard jury instructions suggest that juries be instructed only as to factual cause, as the standard instruction on factual cause now covers both concepts of legal and factual causation. **See** Pa.SSJI (Civ.) 13.20 (Factual Cause).

In an asbestos case, a plaintiff must show that his injuries were proximately caused by the product of a particular manufacturer or supplier,

---

[3] "[L]egal cause frequently does not follow as far as cause-in-fact would lead." **Whitner v. Von Hintz**, 263 A.2d 889, 895 (Pa. 1970). "Legal or proximate causation involves a determination that the nexus between the wrongful acts (or omissions) and the injury sustained is of such a nature that it is socially and economically desirable to hold the wrongdoer liable." **First v. Zem Zem Temple**, 686 A.2d 18, 21 n.2 (Pa. Super. 1996).

that he inhaled asbestos fibers shed by that product, and that he did so in the workplace. *See Eckenrod v. GAF Corp.*, 544 A.2d 50, 53 (Pa. Super. 1988). For the purposes of proving the causation element of negligence in an asbestos case, it is not enough for a plaintiff to demonstrate that asbestos was merely present – it must be shown that exposure to it was "frequent, regular, and proximate." *See Gregg v. V-J Auto Parts, Co.*, 943 A.2d 216, 227 (Pa. 2007) (adopting the "frequency, regularity, and proximity test" as the standard for proving that asbestos is a substantial factor in causing damages).

However, it is not necessary for a plaintiff to specify the exact level or duration of asbestos exposure. *See Andaloro v. Armstrong World Industries, Inc.*, 799 A.2d 71, 86 (Pa. Super. 2002) (quoting *Coward v. Owens-Corning*, 729 A.2d 614, 622-23 (Pa. Super. 1999)); *Fisher v. J.A. Sexauer*, 53 A.3d 771, 775 (Pa. Super. 2012) (same). The evidence of frequency, regularity, and proximity to the substance may take the form of direct or circumstantial evidence, "or a combination of both categories of evidence." *See Gregg*, 943 A.2d at 226.

As to the duty of care, this Court has recognized that in the context of the workplace, an employer has a "heightened duty" to employees:

> As employers, Appellees owed their employees, including [the plaintiff], a duty to protect them not only from known dangers, but also from those which might be discovered with reasonable care. Moreover, Appellees had a duty to their employees to create and maintain a safe work environment, conforming to the conduct of an ordinary, prudent person who has special knowledge as a

- 11 -

person experienced in the business. This includes taking steps to protect their employees from conditions likely to cause them harm. Additionally, Appellees were required to have knowledge of generally known scientific discoveries, to take care to ascertain facts which would indicate danger to their employees, and to take appropriate action if discovered.

*Shellenberger v. Kreider Farms,* 288 A.3d 898, 910 (Pa. Super. 2023) (internal citations omitted).

In this case, the decedent testified that he was frequently, regularly, and proximately exposed to asbestos dust for several years while employed by Lenox from 1974 to 1981. It is undisputed that Lenox manufactured a product during that span which contained asbestos (the Lightsource), and that the decedent designed it without knowing that the transite board used for the device's heat shield was partly composed of asbestos. The decedent testified that Lenox fabricated parts for the Lightsource onsite, including the transite board, so that it could be assembled at the Lenox premises. *See* Deposition of Thomas Constantine, 2/1/2019, at 14, 19-21, 90.

The decedent also described the fabrication process, explaining how co-workers would "cut to size" transite boards and then take them "to the machine shop to put the holes in, mill out the edges." *Id*., at 91. The machinery used included a "band saw" and a "power hacksaw." *Id*., at 95. Additionally, the transite boards had to be drilled in three places – "Two for screws, and one large enough to let the light through." *Id*., at 65. The decedent testified that he personally observed this process on a regular basis "from an arm's length away" between 1974 and 1981, during which time he

and his co-workers would inhale the resulting dust in the surrounding air. *See id.*, at 96, 98.

One of the decedent's co-workers, James Dickson, partly corroborated the decedent's testimony in this regard. Dickson testified in his deposition in 2019 that, as of the date he was deposed, he had been continuously employed by Lenox as a machinist since 1974. *See* Deposition of James Dickson, 4/1/2019, at 8-9. He recalled two occasions during the period of Constantine's employment in which he modified transite boards.

On one of those two occasions, Dickson had difficulty when trying to enlarge a hole in a transite board. Dickson consulted the foreman, who then took some pieces of the board to the office of one of the Lenox managers at the premises, Paul Lang. *See id.*, at 24. When the foreman returned, he immediately told Dickson to stop working and clean himself off with water and an air hose. He was also advised not to eat or smoke until he had thoroughly cleaned off the debris caused from the drilling. *Id.*, at 37-39. This was the only time in his four decades of Dickson's employment with Lenox that any such precautions had been taken. *See id.*, at 39.

Dr. Steven Markowitz and Dr. Evan Alley each testified as to causation. As the decedent's treating oncologist, Dr. Alley was able to observe his

condition and conclude that the decedent suffered from mesothelioma, and that this illness was consistent with his reported exposure to asbestos.[4]

Dr. Steven Markowitz testified at trial that he was a medical doctor board-certified in internal and preventative medicine. He had a subspeciality in the field of occupational medicine, which involves the identification of hazardous materials in the workplace and preventing employees from being exposed to them.

Dr. Markowitz stated that, due to his background in occupational medicine, he was familiar with transite and its association with asbestos. He testified that exposure to "background," or "ambient" levels of asbestos in the open air or general environment are unlikely to lead to the development of mesothelioma. *See* N.T. Trial, 2/15/2022 (morning session), at 37. However, where a patient diagnosed with mesothelioma has reported prolonged or frequent exposure to asbestos in a workplace environment near the source where the substance is released into the air, "then the chances of that exposure producing the mesothelioma are very high." *Id*., at 44-45. Dr. Markowitz explained that "[t]here are very few other known causes of mesothelioma," and none of them were relevant to the decedent. *Id*., at 64.

In Dr. Markowitz's opinion, occupational exposure to asbestos was the cause of the decedent's mesothelioma:

_____

[4] Lenox has challenged the admissibility of expert opinions by these witnesses on the issue of causation. Those claims are addressed separately below.

The basis of that opinion is understanding what [the decedent] did at that workplace, the detail he described, his exposure to asbestos, the whole of his outpatient history, the malignant mesothelioma through the medical records and the details regarding his exposure, which, in my view, were such they provided enough documentation of sufficient exposure to cause malignant mesothelioma.

I tried to eliminate other possible exposures to asbestos. I didn't see any other exposure.

There are very few other known causes of mesothelioma. A few other mineral fibers, radiation therapy can do it for certain cancers. None of them were relevant to him.

So to me, this was a case for someone who identified years of frequent exposure to airborne asbestos by working in close proximity or being in close proximity to where the work was done.

*Id*., at 64.

As to the duty of care that Lenox owed to the decedent, another expert, Dr. Gerald Markowitz, explained that publicly available materials which pre-dated the period of the decedent's employment had advised of the dangers posed by the inhalation of asbestos dust. *See* N.T. Trial, 2/15/2022 (afternoon session), at 19-35; *see also* Trial Court 1925(a) Opinion, 3/2/2023, at 8-9 (summarizing history of academic scholarship on occupational exposure to asbestos).

In particular, OSHA had by 1972 implemented regulations requiring periodic air monitoring to prevent workers from inhaling air contaminated with asbestos. *See* N.T. Trial, 2/15/2022 (afternoon session), at 33. Dr. Markowitz testified that, after reviewing the relevant records and depositions

taken in this case, he saw no indication that Lenox had complied with OSHA's mandates. **See id**., at 59-61.

Based on this evidence, we do not find that the verdict is so contrary to the evidence as to shock one's sense of justice, or that a new trial is needed to give Lenox another chance to prevail. The trial court, sitting as the finder-of-fact, heard evidence that Lenox breached a duty of care to the decedent by exposing him to asbestos, and that this exposure was a factual and proximate cause of the decedent's injures. The evidence was sufficient for the fact-finder to conclude that occupational exposure to asbestos was a substantial factor in causing the decedent to develop mesothelioma. Although Lenox disputed the elements of causation by introducing evidence that it rarely, if ever, modified or fabricated the transite boards at its facilities, and that the levels of asbestos in the air reported by the decedent would not have been concentrated enough to harm him,[5] it was the role of the trial court, sitting as the finder-of-fact, to weigh conflicting evidence and assess the credibility of witnesses.

The trial court credited the account of the decedent and his expert witnesses regarding the duties Lenox owed the decedent, and the causes of his illness. The trial court found that Lenox either should have known of the

---

[5] Lenox presented the testimony of several Lenox employees who recalled that the transite boards arrived to Lenox pre-cut and pre-drilled, and that they were not modified onsite. **See e.g.**, Deposition of Gerald Jacobs, 10/18/2019, at 41, 44. Lenox further presented evidence that it did not have the proper equipment to drill or saw the transite boards.

dangers that asbestos posed, or in fact did know, as evidenced by the experiences recounted by the decedent's co-worker, Dickson. As the trial court's findings and credibility determinations are supported by the record, it did not abuse its discretion in denying the weight of evidence claim in Lenox's post-trial motion.

Lenox's *second* claim is that the trial court erred in denying its motion for compulsory nonsuit. "A nonsuit is proper only if the [trier-of-fact], viewing the evidence and all reasonable inferences arising from it in the light most favorable to the plaintiff, could not reasonably conclude that the elements of the cause of action had been established." *Printed Image of York, Inc. v. Mifflin Press, Ltd.*, 133 A.3d 55, 59 (Pa. Super. 2016) (citation omitted). "A compulsory nonsuit can be granted only at the close of plaintiff's case and before the defendant presents any evidence." *Burns v. City of Phila*., 504 A.2d 1321, 1325 (Pa. Super. 1986).

However, if the defendant elects to proceed to trial and presents a defense after nonsuit has been denied, then the trial court's denial of nonsuit becomes moot. *See Whitaker v. Frankford Hosp. of City of Phila*., 984 A.2d 512, 517 (Pa. Super. 2009). Once a jury verdict in favor of Constantine was entered, the issue became whether the trial court later erred in failing to grant Lenox judgment notwithstanding the verdict. *Id.* In this case, after nonsuit was denied, Lenox went forward with the trial and presented a defense. Accordingly, the nonsuit issue became moot for purposes of

appellate review.  *See id*.; *see also Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.*, 933 A.2d 664, 668 (Pa. Super. 2007) (same).

Lenox's *third* claim is that the evidence was legally insufficient because Constantine did not present expert testimony on the applicable duty, or standard of care, that an employer in Lenox's industry owed to its employees. *See* Appellant's Brief, at 54-58.  The admissibility of expert testimony is an evidentiary issue that is subject to the discretion of the trial court, and on review, a ruling on that subject will only be reversed to correct an abuse of discretion.  *See Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003).

The premise of Lenox's argument is flawed because, in fact, Constantine presented the expert testimony of Dr. Gerald Markowitz, who described at length the duty of care owed to the decedent based on the medical publications and work-safety regulations that were publicly available at the time of the decedent's employment with Lenox.[6]

Moreover, in another asbestos case with similar facts, this *same* witness (Dr. Gerald Markowitz) testified as an expert on the identical subject.  In that

---

[6] Lenox has relied on caselaw which provides that "expert testimony is required to establish professional negligence where the determination of whether the actions were negligent is beyond the understanding of the ordinary person." *Cipriani v. Sun Pipe Line Co.*, 574 A.2d 706, 715 (Pa. 1990); *Storm v. Golden*, 538 A.2d 61, 65 (Pa. Super. 1988).  However, Constantine did not allege, much less attempt to prove, a claim of *professional* negligence.

J-A28024-23

case, ***Shellenberger***, this Court held that the evidence of the defendant's duty of care was legally sufficient:

> Appellant presented evidence in the form of expert reports, as well as medical journals and publications from the Pennsylvania Department of Labor and the Pennsylvania Department of Health, establishing that the dangers of asbestos were generally known in the 1960s. For instance, **Appellant produced an expert report prepared by Gerald E. Markowitz, Ph.D.,** and David Rosner, Ph.D., **in which they conducted a historical review of the relevant medical, scientific, and industrial literature, as well as other publicly available information, to determine, *inter alia*, when it was known and therefore knowable that breathing dust containing asbestos could cause cancer**. Answer to MSJ at Exhibit M ("Expert Report"). Markowitz and Rosner concluded that, beginning in the 1930s, there was a suspected link between breathing asbestos dust and cancer, and that the link was acknowledged by many medical researchers by the mid-1940s. **By the early 1960s, they reported that the range of diseases and cancers associated with asbestos exposure, including mesothelioma, were widely acknowledged and documented**. In July 1964, the Pennsylvania Department of Health's Occupational Division issued a hygienic information guide regarding asbestos, in which it noted the growing accumulation of evidence that exposure to asbestos fibers may cause cancer of the lung, and in the fall of 1965, it warned of the link to lung cancer and mesothelioma from occupational exposure to airborne asbestos dust.
>
> Significantly, Appellant also pointed out that **in June 1972**, the same month that Kreider Farms' dairy processing plant began operating, **[OSHA] enacted its regulations regarding workplace exposures to asbestos**. **These regulations required employers, within six months of their publication, to begin monitoring any place of employment where asbestos fibers were released to determine if each of its employee's exposure to asbestos fibers was below the allowable limit**. The regulations further established methods of compliance, including the adoption of safer work practices, the provision of personal protection equipment and changing rooms, posting caution signs in areas where airborne concentrations of asbestos fibers may exceed the permissible exposure limits, and imposing restrictions on the disposal of asbestos waste.

- 19 -

>**Appellant asserts that despite these federally mandated requirements, Appellees failed to monitor the asbestos levels at the plant and failed to implement any procedures to protect their employees from exposure to asbestos**.
>
>**We believe the foregoing evidence viewed in a light most favorable to Appellant would enable a reasonable jury to conclude that Appellees** should have known **of the dangers of asbestos and the risk that the asbestos-containing boiler components posed to Mr. Shellenberger's health, and that Appellees therefore had a duty to exercise reasonable care to protect him from said hazardous conditions**.

*Shellenberger*, 288 A.3d at 910-11 (emphases added; internal citations omitted).

Here, as in *Shellenberger*, there was evidence establishing that Lenox either knew or should have known of the dangers of asbestos, and that Lenox had a federally mandated duty "to monitor the asbestos levels at the plant and failed to implement any procedures to protect" its employees from that risk. *See id*.

Lenox has attempted to distinguish *Shellenberger* and render it non-controlling here. Although Dr. Gerald Markowitz has given essentially identical testimony in this case and in *Shellenberger* regarding the standard of care and testing regulations in effect at the relevant times, Lenox nevertheless argues that the witness's opinion was still improper because he lacked a background in the manufacturing process for borescopes or other optical instruments.

This distinction is unpersuasive. Dr. Gerald Markowitz testified that the safety standards and regulations he discussed were binding on Lenox during

the period of the decedent's employment. Lenox has presented no evidence that manufacturers of optical instruments were excepted from OSHA regulations at that time. Thus, the trial court did not err in denying Lenox's claim that Constantine presented insufficient evidence concerning the nature of the duty of care owed to the decedent.

Lenox's *fourth* claim is that the trial court abused its discretion in precluding the opinions of a toxicologist, Dr. Brent D. Kerger, regarding the cause of the decedent's mesothelioma. At trial, Lenox sought to admit Dr. Kerger's opinion that the decedent could not have developed mesothelioma at his workplace because he had only been exposed to a *de minimis* dose of asbestos. In his report, Dr. Kerger stated that the decedent's illness must have resulted from alternative causes, such as his age and "genetic factors."

The trial court reasoned that although Dr. Kerger could testify generally on the effect of asbestos on the human body, he lacked the expertise to diagnose the specific cause of the decedent's mesothelioma because he was not a medical doctor, and he had no experience in the diagnosis or treatment of patients. Further, the trial court found that there was no evidence to support a diagnosis of an alternative cause. Dr. Kerger was therefore free to opine generally on whether the reported levels of the decedent's exposure to asbestos could cause mesothelioma, but he was precluded from opining on the specific, or medical cause of the disease. ***See*** N.T. Trial, 2/16/2022

(morning session), at 5; N.T. Trial, 2/16/2022 (afternoon session), at 9; **see also** Trial Court 1925(a) Opinion, 3/2/2023, at 16.

Under Pa.R.E. 702, a witness may testify in the form of an opinion as long as she is qualified to do so "by knowledge, skill, experience, training, or education[.]" The rule makes such opinions admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

"[I]n the context of legal proceedings, if a witness has any reasonable pretension to specialized knowledge *on the relevant subject*, he may be offered as an expert witness, and the weight to be given his testimony is for the trier of fact to determine." **Freed v. Geisinger Med. Ctr.**, 971 A.2d 1202, 1210 (Pa. 2009) (emphasis in original). A trial court's ruling on the admissibility of an expert's opinion is subject to an abuse of discretion standard of review. **See Betz v. Pneumo Abex, LLC**, 44 A.3d 27, 31 (Pa. 2012).

Here, Dr. Kerger was tendered as an expert in the field of toxicology, which is defined as a "branch of medicine that concerns poisons, their effects, their recognition, their antidotes, and generally the diagnosis and therapeutics

of poisoning[.]" TOXICOLOGY, Black's Law Dictionary (12th ed. 2024). Lenox sought to have Dr. Kerger opine specifically at trial that (a) the decedent's exposure to asbestos at the Lenox premises did not cause his mesothelioma, and (b) that the decedent's illness possibly resulted from numerous other causes. It was undisputed that Dr. Kerger had no experience as a medical doctor or as a pathologist. He had never personally examined the decedent, or any other patient, for that matter. Dr. Kerger was allowed to testify as an expert about general causation, but he was not allowed to opine as to specific causation or otherwise diagnose the cause of the decedent's mesothelioma.

In its briefing, Lenox has been unable to refer to a case in which a non-medical doctor with no background or practical experience in the treatment or diagnosis of patients was permitted to opine at trial as to the *specific* cause of a plaintiff's illness. Lenox instead cites to several cases in which a non-medical doctor was permitted to testify *generally* on causation, which is exactly what Dr. Kerger was allowed to do in this case:

> [Counsel]: **Dr. Kerger, do you have an opinion as to whether any of the cutting, drilling or milling of the heat shield in question was sufficient to cause mesothelioma in general**?
>
> [Dr. Kerger]: As I explained, I believe that the upper bound dose estimates that I came up with both based on the testing of the transite material at issue and applying conservative assumptions to existing literature on cutting of transite board material, that **the dose received by [the decedent] would have been nominal**. Far lower than what background would be in terms of background outdoor air, inhalation **and also well below the thresholds for increased risk from mesothelioma among automotive mechanics who do and have received**

> **appreciable above background exposures to chrysotile fibers**.

N.T. Trial, 2/16/2022 (afternoon session), at 9-10 (emphases added).

The two chief cases Lenox discusses in its brief, ***Betz***, 44 A.3d 27, and ***Pratt v. Stein***, 444 A.2d 674, 706 (Pa. Super. 1982), did not compel the trial court to allow Dr. Kerger to opine on the specific, or medical cause, of the decedent's illness.

In ***Betz***, the pertinent issue was whether the expert opinion of an environmental toxicologist could be used to rebut the methodology of a pathologist who had "given a broad-scale opinion on causation applicable to anyone inhaling a single asbestos fiber above background exposure levels." 44 A.3d at 54. Our Supreme Court held that the trial court did not abuse its discretion in allowing the toxicologist to do so. ***See id***., at 55. The Court found that the expert was qualified to opine on general causation because that subject was subsumed by the expert's interdisciplinary field. ***See id***.

In ***Pratt***, a pharmacologist was permitted to opine as an expert that a drug administered to the plaintiff to treat a post-operative infection was toxic, and that safer drugs were available. The defendant had argued that the expert was not qualified to render an opinion on that subject because he had no experience in orthopedic surgery or in the treatment of such infections. This Court rejected the argument because pharmacologists specialize in "the study of various medications, their origin, nature, properties, and effects upon living organisms." ***Pratt***, 444 A.2d at 706. The expert's background qualified the

witness to render an opinion generally on the effect that a particular drug may have on the human body despite that the expert did not practice medicine. *See id*.

Although Lenox has presented *Betz* or *Pratt* as precedent in which a non-medical doctor with no practical or clinical experience with patients was allowed to opine on the specific, medical cause of a plaintiff's injury, an expert did not testify to that effect in either case. The same is true in other cases cited by Lenox for that proposition. *See e.g., McClain ex rel. Thomas v. Welker*, 761 A.2d 155, 157-58 (Pa. Super. 2000) (holding that the trial court erred in precluding an expert with a Ph.D. in neuroscience and psychobiology from opining on causal relationship between brain dysfunction and toxins where expert "maintain[ed] a clinical practice" and "examine[d] patients" suffering from various cognitive disorders); *Freed*, 971 A.2d at 1210 (holding that an experienced nurse who routinely diagnosed "human responses to actual or potential health problems" was qualified to opine as an expert regarding medical causation); *Simmons v. Mullen*, 331 A.2d 892, 898 (Pa. Super. 1974) (holding that opinion testimony regarding specific causation by a non-medical doctor, a psychologist, was improper because the record only

established his expertise in identifying a brain injury, but not that he was "able to ascertain causation[.]").[7]

In this Court's own review of relevant controlling authorities on this topic, we too have been unable to find a case that persuades us that the trial court abused its discretion in limiting Dr. Kerger's expert opinions to those concerning general causation. Rather, the record supports the trial court's ruling that Dr. Kerger's lack of experience in treating and diagnosing patients made it improper for him to give an expert opinion diagnosing the specific, medical cause of the decedent's mesothelioma or offering speculative alternative causes for it. Thus, no relief is due on this claim.[8]

_____

[7] Our finding that the trial court acted within its discretion in precluding Dr. Kerger's diagnostic opinion on specific, or medical, causation is further supported by courts in other jurisdictions which came to the same conclusion under analogous circumstances. *See e.g., In re Silicone Gel Breast Implants Prod. Liability Litig.*, 318 F. Supp. 2d 879, 907 (C.D. Cal. 2004) ("Given these qualifications [in the field of toxicology] – and the absence of evidence that [the expert] has any experience making diagnoses in humans – the Court finds . . . that [the witness] is qualified to render an opinion about general causation, but that he is not qualified to opine on specific causation."); *Landrigan v. Celotex Corp.*, 605 A.2d 1079, 1089 (N.J. 1992) (holding that non-physician scientists may be qualified to "testify on matters of individual causation [in an asbestos case] when their training and experience indicate sufficient expertise," such as "practical experience" and "clinical experience" in the diagnosis of patients); *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 675 (Mo. 1991) (upholding trial court's order allowing toxicologist "to give an opinion as to whether asbestos constitutes the health hazard" but precluding him from testifying "to the opinion as to the cause of the cancer or anything further than that because he is not a medical doctor.").

[8] With respect to Dr. Kerger's excluded testimony that the decedent's mesothelioma resulted from alternative causes, we once more find that the

*(Footnote Continued Next Page)*

Lenox's *fifth* claim is that the trial court erred in allowing Dr. Gerald Markowitz to opine as an expert regarding Lenox's standard of care because (1) he did not rely on any scientific, technical, or other specialized knowledge about that subject, and (2) he did not satisfy the requirements of **Frye** in applying accepted scientific methodology in reaching his conclusions. **See** Appellant's Brief, at 66-68.

In our analysis of Lenox's prior claim, we noted that Pa.R.E. 702 controls the admissibility of expert opinions. Under that rule, a witness may testify in the form of an expert opinion as long as she is qualified to do so "by knowledge, skill, experience, training, or education[.]" A witness is qualified as an expert if their "scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson," and "the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Pa.R.E. 702(a)-(b).

---

trial court did not abuse its discretion. "While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence." **Viener v. Jacobs**, 834 A.2d 546, 558 (Pa. Super. 2003). An expert's opinion "cannot be based solely upon conjecture or surmise" and the expert's "assumptions must be based upon such facts as the jury would be warranted in finding from the evidence." Pa.R.E. 703. In the present case, Dr. Kerger offered mere "conjecture" regarding possible alternative causes, so the trial court did not abuse its discretion in precluding such testimony on that basis.

Where an expert's opinion is derived from novel scientific evidence, the *Frye* test requires the expert's methodology to be "generally accepted in the relevant field." Pa.R.E. 702(c). "[A] *Frye* analysis is not triggered every time science enters the courtroom; it only applies when an expert seeks to introduce novel scientific evidence." *Commonwealth v. Dengler*, 843 A.2d 1241, 1243 (Pa. Super. 2004). A *Frye* hearing is only "warranted when a trial judge has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions." *Betz*, 44 A.3d at 53.

In the present case, we discern no error on the part of the trial court in admitting the expert opinions of Dr. Gerald Markowitz. Constantine proffered this witness as an expert in the history of occupational health and public health with a special interest in the history of health issues pertaining to asbestos. He has taught and published in this field for many years. His testimony consisted of a historical review of the medical, scientific, industrial hygiene and industrial literature. Further, as Lenox recognizes, Dr. Gerald Markowitz relied on publicly available literature, as well as the implementation of federal OSHA regulations, which illustrated the general awareness of the dangers that asbestos posed as far back as the 1920's, and certainly by the 1970's.

With his academic background, there is no question that Dr. Gerald Markowitz possessed "scientific, technical, or other specialized knowledge" in his field beyond that of the average layperson, satisfying Pa.R.E. 702(a).

Further, there is no doubt that his specialized knowledge would help the trier of fact understand the evidence and determine a fact in issue – whether Lenox knew or should have known about the health hazards associated with asbestos during the period of the decedent's employment. Dr. Gerald Markowitz's testimony therefore satisfied Pa.R.E. 702(b). *See Freed*, 971 A.2d at 1210; *Shellenberger*, 288 A.3d at 910.

Lenox's assertion of a *Frye* error under Pa.R.E. 702(c) is likewise unavailing. There was nothing novel about Dr. Gerald Markowitz's methodology. He simply reviewed decades' worth of historical scholarship on occupational exposure to asbestos and opined on the extent to which that danger would be generally known at the times relevant to this case. *Frye* was therefore inapplicable, and the trial court therefore did not abuse its discretion in admitting Dr. Gerald Markowitz's testimony.

Lenox's *sixth* claim is that the trial court erred in allowing Dr. Steven Markowitz to offer an expert opinion on the subject of causation. The specific contention is that this expert's diagnostic opinion linking asbestos exposure at the decedent's workplace to his development of mesothelioma should have been excluded because it was established at trial that the decedent was exposed to only a trivial amount of airborne asbestos dust.

We find no merit in this claim, as it is, in substance, a disagreement with the trial court's credibility determinations. The decedent testified that, over a period of several years, the fabrication of transite boards caused him

to inhale dust containing asbestos fibers. If believed, this was "regular, frequent, and proximate" contact with the substance that could constitute a substantial factor. *See Eckenrod*, 544 A.2d at 53; *see also Gregg*, 943 A.2d at 227.

Dr. Steven Markowitz was indisputably qualified to opine on the causal link between an individual's reported inhalation of asbestos fibers and the probability that it would lead to mesothelioma. Dr. Markowitz expressly relied on the decedent's account when opining that his occupational exposure to asbestos was the medical cause of his illness. Since there is evidence in the record that supports the trial court's credibility determination with respect to the decedent's reported exposure, and the witness had the requisite medical and scientific expertise, the trial court did not abuse its discretion in admitting Dr. Markowitz's diagnostic opinion.

Lenox's *seventh* claim is that the trial court erred allowing Dr. Evan Alley to testify as an expert on the subject of causation.

Dr. Alley was the decedent's treating oncologist who specialized in the diagnosis, care, and treatment of mesothelioma. As such, he was clearly qualified to testify as an expert in those fields. In his deposition testimony, which was admitted at trial, he primarily testified about the diagnosis and treatment of the illness.

Lenox's claim of error is that Dr. Alley was permitted to answer (affirmatively) when asked if the decedent's mesothelioma was caused by his

occupational exposure to asbestos. ***See*** Deposition of Dr. Evan W. Alley, 12/9/2019, at 47-48. Lenox argues that Dr. Alley was not qualified to make that diagnosis because Constantine never established Dr. Alley's expertise as to the properties of transite and the release of asbestos from that material in the decedent's workplace.

There is some merit to Lenox's contention that Dr. Alley lacked sufficient expertise to diagnose the medical cause of the decedent's illness. Dr. Alley made it clear in his testimony that his opinion regarding causation was only "based on [the decedent's] answers to interrogatories and the videotaped deposition under oath, describ[ing] his exposure to asbestos and that's what . . . from a medical oncology perspective" practitioners in the field would use "to make that conclusion about the cause of his disease." Deposition of Dr. Evan W. Alley, 11/19/2019, at 222; ***see also id***., at 235 (admitting that the opinion on medical cause was derived from the decedent's deposition testimony regarding his frequent exposure).

It was undisputed that Dr. Alley was qualified to testify as an expert in diagnosing mesothelioma. It is also undisputed that, generally, the inhalation of asbestos fibers is the primary cause of that disease. Dr. Alley testified at length that he relied on the decedent's self-reported occupational exposure to asbestos in order to identify it as the cause of his mesothelioma.

However, Dr. Alley qualified his opinion. Unlike Dr. Steven Markowitz, who was well-versed in the properties of transite, Dr. Alley admitted in his

examination that he did not know anything about that material, and that he had no relevant experience in linking a patient's occupational exposure to asbestos with the development of mesothelioma. His opinion on causation hinged solely on the veracity of the decedent's testimony and the fact that the inhalation of asbestos fibers may cause mesothelioma. In short, Dr. Alley did not apply any particular methodology supporting his opinion on medical causation, as is required by Pa.R.E. 702.

We nevertheless find that no relief is due. "An error is harmless if the court determines that the error could not have contributed to the verdict." *Bensinger v. Univ of Pittsburgh Med. Ctr.*, 98 A.3d 672, 683 n.12 (Pa. Super. 2014). "Moreover, we will not reverse the trial court's denial of a new trial unless there is a clear abuse of discretion or an error of law, which controlled the outcome of the case." *Gunn v. Grossman*, 748 A.2d 1235, 1243 (Pa. Super. 2000).

Here, Constantine's primary expert on the issue of medical causation was Dr. Steven Markowitz, who was familiar with the properties of transite and the release of asbestos fibers into the surrounding air when that material is manipulated in the way described by the decedent. Dr. Markowitz testified on those subjects at length and opined that occupational exposure to asbestos caused the decedent's mesothelioma. The trial court credited that testimony, as well as the account of the decedent regarding how often transite boards were fabricated at his workplace.

By contrast, Dr. Alley's role in Constantine's case was to provide the basis for his diagnosis of mesothelioma and recount the decedent's medical treatment for that illness. He opined on medical causation in a short answer during his testimony, and he later clarified on cross-examination that he had no knowledge of transite's properties.

In its 1925(a) opinion, the trial court (which sat as the finder-of-fact), found that even if Dr. Alley's opinion should have been precluded, it was "the epitome of harmless error," indicating that the opinion was given little to no weight. **See** Trial Court 1925(a) Opinion, 3/2/2023, at 14. Having reviewed all the facts of this case, as well as the applicable law, we agree with the trial court that Dr. Alley's opinion on causation was harmless. In light of the additional evidence of causation that Constantine presented at trial, as well as the minimal weight assigned to Dr. Alley's opinion by the fact-finder, the admission of that opinion (even if erroneous) could not have affected the outcome of the case.

Lenox's *eighth* claim is that the trial court erred in rejecting its contention that the holding of **Tooey v. AK Steel Corp.**, 81 A. 3d 851 (Pa. 2013), is unconstitutional, as applied in this case. According to Lenox, the holding of **Tooey** "deprived Lenox of its substantive property rights without due process of law" because it would have been shielded from Constantine's negligence claim but for our Supreme Court's interpretation of Pennsylvania's Workers' Compensation Act (the Act), 77 P.S. §§ 1-2710. **See** Appellant's

Brief, at 77. The constitutionality of a statute involves a pure question of law, subject to a *de novo* standard of review. **See Yanakos v. UPMC**, 218 A.3d 1214, 1218 n.6 (Pa. 2019).

Although Lenox cites several constitutional provisions as the basis of its claim, the substance of its argument is that **Tooey** changed existing law by extinguishing a vested or absolute defense akin to a statute of limitations or repose. This argument implicates the "due course of law" provision of Article I, Section 11 of the Pennsylvania Constitution. The section "is invoked when a change in . . . legislation attempts to alter or eliminate a vested or accrued cause of action." **Dana Holding Corp. v. Workers' Comp. Ap. Bd. (Smuck)**, 195 A.3d 635, 643 (Pa. Cmwlth. 2018). "[T]he principle also applies to protect a party's vested or accrued absolute defense from being extinguished." **Id**. We find no merit in Lenox's constitutional challenge.

In **Tooey**, two employees developed mesothelioma decades after their work-related exposure to asbestos products. **See** 81 A.3d at 856. The narrow issue before our Supreme Court was whether the employees' illnesses fit the definition of "injury" under Section 301(c)(2) of the Act, such that the Act's exclusivity provision in Section 303(a) would not apply.

Under Section 303(a) of the Act, "liability of an employer . . . shall be exclusive and in place of any and all other liability to such employes . . . in any action at law or otherwise on account of any injury or death as defined in section 301(c) . . . or occupational disease as defined in section 108." 77 P.S.

- 34 -

§ 481(a). Section 301(c)(2) of the Act, in turn, defines the pertinent terms

as follows:

> The terms "**injury**," "personal injury," and "injury arising in the course of his employment," as used in this act, **shall include** . . . **occupational disease** as defined in section 108 of this act [i.e., 77 P.S. § 27.1]: ***Provided, That whenever occupational disease is the basis for compensation, for disability or death under this act, it shall apply only to disability or death resulting from such disease and occurring within three hundred weeks after the last date of employment*** in an occupation or industry to which he was exposed to hazards of such disease: And provided further, That if the employe's compensable disability has occurred within such period, his subsequent death as a result of the disease shall likewise be compensable.

***Tooey***, 81 A.3d at 858 (quoting 77 P.S. § 411(2)) (emphases in original).

The employees in ***Tooey*** argued that their illnesses did not fall under

the Act's definition of "injury" in the above section because they first

manifested *more than* 300 weeks after the last date of employment. ***See id***.

Applying the rules of statutory construction, our Supreme Court agreed with

the employees that their interpretation was reasonable, consistent with the

plain language of the statute, and in step with the intent of the legislature.

***See id***., at 860-65.

The Court therefore held that "the exclusivity provision of Section 303(a)

does not apply to preclude an employee from filing a common law claim

against an employer" for injuries or occupational diseases that manifest

beyond the 300-week window. ***Id***., at 855. This interpretation of the Act

ensured that employees such as the decedent in the present case would be

permitted to sue their employers in tort for asbestos-related damages that

manifested more than 300 weeks after the most recent occupational exposure to that substance. *See id*.

The main flaw in Lenox's claim is that it has not identified a "vested right" in a defense afforded by the Act. The Act itself was not amended by the General Assembly in this regard, and our Supreme Court did not announce a new change in the law. Rather, the Court *interpreted* an existing law for the first time and determined that the definition of "injury" excludes an occupational disease that manifests more than 300 weeks after the employee's last occupational exposure.

"[A] person has no vested right arising out of a judicial interpretation of a statute so as to prevent a later interpretation from applying to the facts of his case." **Bible v. Com., Dep't of Lab. & Indus.**, 696 A.2d 1149, 1154 (Pa. 1997). Here, prior to the **Tooey** decision, Lenox apparently presumed that the decedent had suffered the type of injury for which there would be no compensable remedy because his illness manifested in 2016, beyond the time-period for seeking relief under the Act (300 weeks after the decedent's employment ended in 1981). Once **Tooey** was decided, the meaning of "injury" was *clarified*, ensuring the right of the decedent and Constantine to file suit. This in no way deprived Lenox of a vested right in a defense to a

cause of action in tort because such a right had never existed in the first place. Thus, the trial court did not err in denying Lenox's constitutional claim.[9]

Lenox's *ninth* claim is that the trial court erred in instructing the parties to submit transcripts upon which the parties relied instead of having them read into the record during trial.

We find no merit in this ground. The trial court stated in its 1925(a) that it reviewed all relevant transcripts "with the same vigor" when assessing the merits of Lenox's post-trial motion. **See** Trial Court 1925(a) Opinion, 3/2/2023, at 17. Lenox has not specified how the trial court's action caused it prejudice. Nor has Lenox provided any authority that would establish its entitlement to relief on this basis. Thus, the claim was properly denied.

Lenox's *tenth* and final claim is that the trial court abused its discretion in awarding economic loss damages in excess of the amounts given by the parties' damages experts. Again, no relief is warranted.

_____

[9] In its Reply Brief, Lenox framed the issue as an "unforeseeable judicial enlargement" of the Act which violates the constitutional prohibition on *ex post facto* laws, violating Lenox's due process rights. **See** Appellant's Reply Brief, at 16-20. However, this argument fails for similar reasons as those outlined above. Before **Tooey** was decided, the scope of an "injury" under the Act was at best ambiguous. It follows that, by interpreting the term, our Supreme Court did not unforeseeably "enlarge" the Act to Lenox's detriment as it claims. In fact, we are bound by our Supreme Court's determination in **Tooey** that its reading of "injury" is both reasonable and in line with legislative intent – as such, Lenox had notice of the Act's scope from the plain language of the statute long before **Tooey** was decided. Thus, Lenox's due process rights were not violated.

At trial, Lenox's damages expert, Chad Staller, estimated that Constantine's total economic losses were no more than $261,214.00. Constantine's damages expert, Verzilli, estimated Constantine's economic losses (including the loss of the decedent's earning potential and loss in services) to be between $337,310.00 and $654,048.00. The trial court ultimately awarded a verdict in the amount of $2,218,444.74 (excluding delay damages).

"Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant." *Haines v. Raven Arms*, 640 A.2d 367, 369 (Pa. 1994). An award of damages by the trier-of-fact "should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." *Ferrer v. Trustees of Univ. of Penn.*, 825 A.2d 591, 611 (Pa. 2002). "If the verdict bears a reasonable resemblance to the damages proven, we will not upset it merely because we might have awarded different damages." *McManamon v. Washko*, 906 A.2d 1244, 1264 (Pa. Super. 2008).

We are unable to discern any such error in the trial court's verdict amounts in light of the evidence before us and the absence of any favorable legal authority cited by Lenox. Verzilli's calculations only concerned the decedent's lost earning capacity and services, and the high end of the estimate

was $654,048.00. But this was only one category of the damages that were available to Constantine under the Wrongful Death Act and the Survival Act.

The Wrongful Death Act permits the recovery of "the value of the decedent's life to the family, as well as the expenses caused to the family by reason of the death." **Slaseman v. Myers**, 455 A.2d 1213, 1218 (Pa. Super. 1983); **see also** 42 Pa.C.S.A. § 8301; **In re Estate of Coleman**, 772 A.2d 1026, 1027 (Pa. Super. 2001).

The Survival Act (42 Pa.C.S.A. § 8303) permits a decedent's estate to recover the damages sustained by the decedent prior to his death – "survival damages are essentially those for pain and suffering endured by the decedent between the time of injury and death." **Amato v. Bell & Gossett**, 116 A.3d 607, 625 (Pa. Super. 2015). "The measure of damages awarded . . . include the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of his earning power – less personal maintenance expenses, from the time of death through his estimated life span." **Coleman**, 772 A.2d at 1027 (quoting **Kiser v. Schulte**, 648 A.2d 1, 4 (Pa. 1994)). A loss of consortium claim "is intended to compensate one for the loss of services, society, and conjugal affection of one's spouse occasioned by an injury to that spouse." **Amato**, 116 A.3d at 626.

Here, the trial court specified that the decedent's wife was awarded $700,000.00 in damages for her loss of consortium; the decedent's wife and children were awarded $700,000.00 pursuant to the Wrongful Death Act; and

the decedent's estate was awarded $818,444.74 pursuant to the Survival Act. Other than point to the conflicting estimates between the parties' experts regarding the decedent's earning potential and lost wages, Lenox has not shown how these verdict amounts resulted from caprice, prejudice, partiality, corruption or some other improper influence. Thus, no relief is due on this claim.[10]

We now address the issues raised in Constantine's cross-appeal. After the verdict was entered, Constantine filed a petition for delay damages, seeking a total amount of $392,896.41. The trial court granted delay damages in the amount of $109,152.02, and that portion of the award is not subject to our present review.

At issue now, rather, is Constantine's challenge to the part of the trial court's order denying the remaining amount she sought, **$283,744.39**. Specifically, Constantine seeks to recover delay damages she claims were accrued during the following time periods:

- June 20, 2018, to December 31, 2018 ($64,852.26)

- December 11, 2019, to November 21, 2020 ($121,522.18)

---

[10] We add that it is unclear whether Lenox preserved this ground for appellate review. The issue of the verdict amounts raised in Lenox's brief does not appear in its post-trial motion, and Lenox makes no reference to a timely motion for remittitur before the trial court. Accordingly, the issue is both meritless and waived. *See Rettger v. UPMC Shadyside*, 991 A.2d 915, 932 (Pa. Super. 2010) (finding that challenge to verdict amount was preserved by motion for remittitur, but later waived where appellant had not cited any relevant authority for a reduced award of damages in its brief).

- January 1, 2021, to May 13, 2022 ($97,369.95)

*See* Appellees' Brief, at 5-6.

Under Pa.R.Civ.P. 238, a plaintiff may be entitled to recover damages for delay in addition to the amount of compensatory damages awarded against each defendant found to be liable to the plaintiff in the verdict of the fact-finder. *See* Pa.R.Civ.P. 238(a)(1). This rule serves several functions: to compensate plaintiffs for money that would have been earned if it had been promptly received; to encourage settlements; and to prevent defendants from unjustly enriching themselves with the accrual of interest on funds which rightfully belong to plaintiffs. *See Sopko v. Murray*, 947 A.2d 1256, 1258 (Pa. Super. 2008).

Delay damages begin to accrue a year after the date on which "original process was first served in the action up to the date of the award, verdict, or decision." Pa.R.Civ.P. 238(a)(2). However, delay damages will not accrue after a defendant has made a written settlement offer, "provided that the plaintiff obtained a recovery which did not exceed the amount described in subdivision (b)(3)[.]" Pa.R.Civ.P. 238(b)(1)(i).

Subsection (b)(3) defines this threshold amount as "125 percent of either the specified sum or the cost of the structured settlement plus any cash payment to the plaintiff." Pa.R.Civ.P. 238(b)(3). Of more relevance here (because Lenox did not make a qualifying settlement offer), delay damages

are not recoverable for the time "**during which the plaintiff caused delay of the trial.**" Pa.R.Civ.P. 238(b)(1)(ii) (emphasis added).[11]

This Court has strictly interpreted subsection (b)(1), remarking that it enumerates "two, and only two, periods of time to be excluded from delay damages[.]" *King v. SEPTA*, 557 A.2d 11, 12–13 (Pa. Super. 1989) (*en banc*). Crucially, where a period of delay was not caused by either party, the period may not be excluded – "The drafters of the new rule 'have *not* allowed for the exclusion of periods of delay not caused by either party.'" *King*, 557 A.2d at 13 (quoting *Miller v. Wise Business Forms, Inc.,* 553 A.2d 443, 446 (Pa. Super. 1989)) (emphasis in original).

Examples of delays that may be excludable are those that result from a plaintiff's lack of representation, *see Gunn v. Grossman*, 748 A.2d 1235 (Pa. Super. 2000), or a plaintiff's request for a stay or a continuance in the absence of reasonable diligence, *see Tindall v. Friedman*, 970 A.2d 1159, 1178 (Pa. Super. 2009). Conversely, administrative delays imposed by the court are *not* to be attributed to a plaintiff and excluded for purposes of Rule 238. *See Cruz v. Northeastern Hosp.*, 801 A.2d 602, 613 (Pa. Super. 2002).

_____

[11] Although Lenox, in its briefing, repeatedly refers to settlement offers it made to Constantine, Lenox does not assert that any such offers were of a sufficient amount to satisfy the requirements of Pa.R.Civ.P. 238(b)(1)(i). Additionally, the trial court did not find that Lenox made any offer that would justify the exclusion of time from the delay damages calculation.

"It is the defendant who bears the burden of proof when opposing the imposition of delay damages and may do so by establishing that . . . the plaintiff was responsible for specified periods of delay." ***Sopko***, 947 A.2d at 1258. A trial court's interpretations of the procedural rules are subject to a *de novo* standard of review. ***See Marlette v. State Farm Mut. Auto. Ins. Co.***, 57 A.3d 1224, 1228 (Pa. 2012). To the extent a ruling on delay damages is based on factual findings or weighing of the evidence, the determination may only be overturned to correct an abuse of discretion, which includes a misapplication of law "or such lack of support [in the record] as to be clearly erroneous." ***Krebs v. United Refining Co. of Penn.***, 893 A.2d 776, 786 (Pa. Super. 2006) (quoting ***Hoy v. Angelone***, 720 A.2d 745, 751 (Pa. 1998)).

We first evaluate the excluded period of **June 20, 2018, to December 31, 2018**. The trial court did not give its reasons for excluding this period from the time in which delay damages would accrue. More importantly, we are unable to discern from the facts and controlling authority on this issue how the period could possibly be excludable.

Lenox was served with original process on June 20, 2017, and a verdict was entered in Constantine's favor on May 13, 2022. Accordingly, under Rule 238, and barring any applicable exceptions, Constantine was entitled to delay damages accrued from June 20, 2018 (a year after original process was served) and the date of the verdict. ***See*** Pa.R.Civ.P. 238(a)(2).

Lenox argues that the trial court's ruling as to the period (June 20, 2018, to December 31, 2018) was proper because it resulted from Constantine's efforts to name Esterline as a defendant in the action. On December 28, 2017, the trial court had granted Constantine leave to file an amended complaint naming Esterline as a defendant; an amended complaint, including Esterline, was filed about four months later, on April 6, 2018.

However, we do not see how Lenox has carried its burden of proving that Constantine delayed the trial due to the proceedings leading to Esterline being added to the case. As Constantine has pointed out, delay damages did not even begin to accrue until *after* she filed her amended complaint on April 6, 2018. Further, the case was not initially listed for trial until July 26, 2018, at which time the trial date of March 4, 2019, was set.

The record does not at all establish how the timing of Constantine's amended complaint affected the date of the trial. Thus, the trial court abused its discretion in excluding this period (June 20, 2018, to December 31, 2018) from the calculation of delay damages because it was clearly erroneous and a misapplication of Rule 238.

We next evaluate the period of **December 11, 2019, to November 21, 2020**. Again, the trial court gave no reason for excluding this period in its 1925(a) opinion. And yet again, the above facts and authorities do not support the exclusion or demonstrate that Lenox carried its burden of proving that this period should be excluded.

Lenox argues that the trial court's exclusion of this time from the calculation was proper because it resulted from Constantine's attempts to challenge Esterline's dismissal by way of an interlocutory appeal, leading to the placement of the case into a deferred status.

After Esterline was added to the case, it filed a motion *in limine* on December 2, 2019, to exclude all evidence relating to Constantine's attempt to pierce the corporate veil between Esterline and Lenox. The trial court granted the motion orally on December 10, 2019. The next day, on December 11, 2019, Esterline was dismissed from the case by written order, and Constantine began seeking an interlocutory appeal of the ruling. On January 9, 2020, Constantine filed her petition with this Court. Interlocutory review was denied, and the trial court received this Court's order denying review on March 3, 2020.

Less than two weeks later, on March 16, 2020, our Supreme Court declared a statewide judicial emergency "to safeguard the health and safety of court personnel, court users, and members of the public due to the circumstances surrounding the COVID-19 virus." *In re: General Statewide Judicial Emergency*, 228 A.3d 1283, 1283 (Pa. 2020). An order entered by the Court two days later directed the suspension of all judicial business in the Commonwealth. *See id*. The Court of Common Pleas of Philadelphia County entered a similar order on March 17, 2020, and no trials were held in the county pursuant to those orders. *See* Administrative Order No. 9 of 2020.

It was not until November 21, 2020, while the emergency orders were still in effect,[12] that the trial court removed the present case from deferred status. The record does not make it clear why the trial court waited until that particular date to do so – the trial court does not explain its action in the 1925(a) opinion, and Lenox's brief is equally silent in that regard.

As to this period (December 11, 2019, to November 21, 2020), we find nothing in the record or in the applicable law that supports the trial court's ruling that delay damages did not accrue. Constantine promptly began seeking to file an interlocutory appeal as soon as the trial court made a dispositive ruling on the piercing of Esterline's corporate veil. The time it took for this Court to decide the appealability of the trial court's order, as well as the eight months it took for the trial court to remove the case from deferred status, were plainly not attributable to Constantine.

Further, the delays between March 16, 2020, and November 21, 2020, were attributable to judicial emergency orders which prevented any trials from being held. This Court held in *Getting v. Mark Sales & Leasing, Inc.*, 274 A.3d 1251, 1261-62 (Pa. Super. 2022), that delay damages accrued during that time, as they resulted from administrative decisions and not the actions of plaintiffs. Thus, the trial court erred as a matter of law in excluding the

_____

[12] The judicial emergency was extended in Philadelphia County by a series of orders, with the final extension continuing until October 1, 2021.

period from December 11, 2019, to November 21, 2020, from the calculation of delay damages.[13]

Lastly, we evaluate the exclusion of the period between **January 1, 2021, and May 13, 2022** (the day the verdict was entered).[14]  In its 1925(a) opinion, the trial court emphasized that the trial had been delayed by emergency court closures resulting from the global COVID-19 pandemic.  ***See*** Trial Court 1925(a) Opinion, 3/2/2023, at 18.  The trial court reasoned that it would be "unjust" for damages to accrue against Lenox because the delays were not its fault.  ***See id***.  The trial court stated further that, "[i]t is clear from a reading of the rule [Pa.R.Civ.P. 238] that the Supreme Court intended to except delays that Defendants were not responsible for."  ***Id***.

The trial court's rationale is problematic.  Its analysis of the delay damages issue aptly begins with references to Rule 238, as well as our opinion in ***Getting***, 274 A.3d 1251, where this Court held that COVID-related administrative delays to a trial are *not* excludable from the calculation of delay damages.  The trial court then acknowledged that Constantine did not cause such delays here.  ***See*** Trial Court 1925(a) Opinion, 3/2/2023, at 18.

_____

[13] Neither the trial court, nor Lenox, have specifically accounted for the period between March 3, 2020, and March 16, 2020, and we find, for the reasons outlined above, that Lenox did not carry its burden of proving that Constantine delayed the proceedings during that span.

[14] The period between November 21, 2020 and January 1, 2021, is not in dispute.

It seems that the trial court nevertheless declined to apply ***Getting*** based on its assumption that the unique challenges posed by the COVID pandemic could not have been anticipated when our Supreme Court drafted Rule 238. ***See id***. But regardless of that implicit logic, the trial court's ruling was erroneous as a matter of law, as our mandate in ***Getting*** was directly controlling.

Court business was suspended in Philadelphia County due to a judicial emergency from March 17, 2020, until October 1, 2021. The trial in this case took place from February 14 to February 16, 2022, and the verdict in this case was entered on May 13, 2022. The record does not show that Constantine was responsible for any delays at the relevant times in 2021 or 2022. Rather, it was only established that the trial was delayed by the administrative action taken by the court in response to the pandemic. Under ***Getting***, the period of delay could not be excluded from the calculation of delay damages pursuant to Rule 238.

The trial court therefore erred in two respects – first, in disregarding our mandate in ***Getting***, and second, in misapplying Rule 238, which does not contemplate whether a *defendant* caused a delay. ***See*** Pa.R.Civ.P. 238. Thus, as to the delays caused by COVID-related closures, the trial court abused its

discretion and erred as a matter of law in excluding that time from the delay damages calculation.[15]

Order on post-trial motion entered on September 29, 2022, affirmed. Order on delay damages entered on October 7, 2022, affirmed in part, reversed in part. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/17/2024

---

[15] We briefly respond to Lenox's argument that Constantine is responsible for the COVID-related delays in the case because, but for the earlier timing of her amended complaint and attempt to file an interlocutory appeal, the case would have been resolved before the judicial emergency began. This ground for affirmance is moot due to our determination that those earlier periods cannot be excluded from the Rule 238 calculation. But even if Lenox's claim were not moot, it would lack merit due to being entirely speculative, inconsistent with Rule 238, and contrary to our holding in **Getting**.